## Willis E. Gray v. Bloomington & Normal Railway, et al.

1. CONTRACT—*when not void as constituting a voting trust.* A contract which has for its object the vesting and retaining for a fixed period the management and control of an enterprise in the persons who originally promoted the same, is valid so long, at least, as each of such parties retains his original interest and no other rights intervene, and the same may be enforced in a court of equity.

2. CONTRACT—*when sustained by sufficient consideration.* A seal to an instrument imports a consideration and will sustain the same against the charge of a lack of consideration.

3. CONSIDERATION—*what sufficient by way of.* Mutual promises made between and among the respective contracting parties constitute a sufficient consideration to support a contract.

4. RESCISSION—*what will effect.* Where parties to a contract which requires their procedure in a financial enterprise in a particular manner, adopt and pursue without the consent of the other contracting parties an entirely different mode of procedure than that provided by

the contract, a rescission is effected as against the parties so departing from the terms of the contract.

5. TRUST—*what terminates.* Where parties in whom a trust is imposed depart from the terms thereof, they thereby render such trust ineffective as to them.

6. LACHES—*when rule of, applies.* A court of equity will apply the doctrine of laches in denial of relief only where, from all the circumstances, to grant the relief to which the complainant would otherwise be entitled, would be presumptively inequitable and unjust because of the delay.

7. STOCKHOLDERS' MEETINGS—*when valid.* Stockholders' meetings held pursuant to signed waivers of notice are valid.

8. MULTIFARIOUSNESS—*defined.* Multifariousness is the improper joining in one bill of distinct and independent matters.

9. MULTIFARIOUSNESS—*when bill not subject to charge of.* A bill is not multifarious merely because all of the parties joined therein have not an interest in all of the matters therein alleged. It is sufficient if each party has an interest in some of the matters in the suit and that all of such matters are connected.

10. ALTERNATIVE RELIEF—*right of complainant to seek.* While a complainant is not entitled to allege two inconsistent states of fact and ask for relief in the alternative, he may state the facts and ask alternate relief according to the conclusions of law which the court may draw therefrom.

11. GENERAL DEMURRER—*when should be overruled.* Where a bill in equity sets out various claims to the interposition of the court, a general demurrer to the whole bill will be overruled if any of the claims afford a proper case for the jurisdiction of the court.

Bill in chancery. Appeal from the Circuit Court of McLean County; the Hon. COLOSTIN D. MYERS, Judge, presiding. Heard in this court at the May term, 1904. Reversed and remanded. Opinion filed April 20, 1905.

**Statement by the Court.** April 28, 1902, appellant filed a bill in the Circuit Court of McLean County against A. E. DeMange, the Bloomington & Normal Railway, A. E. DeMange, as president, and J. F. DeMange, as secretary of said Bloomington & Normal Railway. Afterwards, on May 31, 1902, he filed an amended and supplemental bill in said cause, adding as a defendant the Bloomington Electric Light Company. Demurrers were sustained to this amended and supplemental bill, and on January 22, 1903, he filed in said cause an amended and supplemented amended and supplemental bill, adding as defendants J. F. Evans,

John Eddy, the City District Heating Company, the Bloomington & Normal Railway Electric & Heating Company, and the Thompson, Tenny & Crawford Company. Demurrers were sustained to the last named bill, appellant stood by the bill, and decree was entered dismissing the bill for want of equity. The case is here on appeal from that decree.

By the amended and supplemented amended and supplemental bill, it is averred, in substance, as follows: That on May 31, 1898, A. E. DeMange, one of the defendants hereinafter named, entered into an agreement with George McIntosh, John Eddy, J. F. Evans and complainant, whereby said DeMange was to purchase for himself and said McIntosh, Evans, Eddy and complainant, to be owned by them in equal parts, an undivided half interest in all the property, rights and franchises of the Bloomington City Railway, at sale thereof to be made on said date, by the master in chancery of McLean County; that in pursuance of said agreement, said DeMange did, on May 31, 1898, in conjunction with one John Graham, who purchased the other undivided half of said property, purchase at said master's sale, an undivided one-half of the property aforesaid; that thereupon and with a view to conveying thereto the property so purchased at said sale, the Bloomington & Normal Railway, a corporation (hereinafter for brevity designated herein as the Railway), was organized with a capital stock of $250,000, divided into 2,500 shares of $100 each, and 1,250 of said shares were subscribed for by said A. E. DeMange, said subscription being made by said DeMange for the equal benefit of himself, said Evans, McIntosh, Eddy and complainant, and 1,250 of said shares were subscribed for by said Graham; that the corporate organization of said Railway was completed June 17, 1898, and thereupon said DeMange and said Graham conveyed to said company the entire property purchased by them at the master's sale aforesaid, and in consideration each received in his name 1,250 shares of the capital stock of said Railway, and $67,500 of first mort-

gage bonds upon all the property of said company; that on June 30, 1898, a written agreement was entered into by and between said DeMange, McIntosh, Eddy, Evans and complainant, which, after reciting that DeMange had purchased at master in chancery's sale May 31, 1898, under the decree of the Circuit Court of McLean County, Illinois, an undivided one-half interest in all the property, rights and franchises theretofore belonging to the Bloomington City Railway, provides, in part, substantially as follows: That DeMange, having conveyed to the Bloomington & Normal Railway his entire undivided one-half interest in said property in exchange for 1,250 shares of railway capital stock, par value $125,000, and for $67,500 of the first mortgage bonds of said Railway would assign to said McIntosh, Eddy, Gray and Evans, each 250 shares of the said capital stock of the said Railway, and assign to the said McIntosh, Eddy, Gray and Evans each an undivided one-fifth interest in said bonds; that the said stock and the said bonds were to be deposited in a bank in the city of Bloomington, to be selected by a vote of three-fifths of the parties thereto, to be held by the said bank, subject to the written order signed by not less than three-fifths of the parties thereto; the said stock and the said bonds so to be held by the said bank as a guaranty, security, or pledge to each of the parties thereto, that the following described notes should all be paid either at their maturity or at the end of any extension that might be procured, and that no one of the parties thereto should be burdened with the payment of more than his one-fifth share thereof: One note signed by George McIntosh and Helen McIntosh for $15,000; one note signed by McIntosh, Gray and DeMange and indorsed by Eddy and Evans for $7,500; one note signed by Evans, McIntosh, Gray, Eddy and DeMange for $15,000; one note signed by Eddy, Gray and McIntosh and indorsed by De-Mange and Evans for $7,500; one note signed by Eddy, Gray, Evans, McIntosh and DeMange for $15,000; one note signed by Eddy, Gray, Evans, McIntosh and DeMange for $7,500.

Gray v. Bloomington & Normal Ry.

That when said certificates of stock and bonds were so deposited in bank for the purpose aforesaid, the same might be withdrawn from the said bank upon the said written order signed by three-fifths of the parties thereto, but only for the purpose of depositing the same in some other bank for the purpose hereinbefore set forth, or for the purpose of selling the said bonds and devoting the proceeds of such sale to the payment of the said notes, or for the purpose of using the said bonds as collateral security with which to procure extensions of the said notes until the same could be paid; and when the said notes, or any extensions thereof, were fully paid, then the said bonds, or what might be then left of them, should be equally divided among the parties thereto, and the said certificates of stock should be delivered to one of the parties to be selected by four of the five parties thereto, the said stock to be held by the party so selected, for a period of ten years, in trust for the others, and voted as a unit at all annual and special meetings of the stockholders of said corporation, upon all questions arising at such meetings, as four-fifths of the said parties thereto should direct in writing; and in case four of the parties thereto could not agree as to how said stock should be voted, then the two of said parties failing to agree with the other three, should offer their stock for sale to the other three parties in the manner thereinafter provided; and in case said three parties should fail to purchase the stock of the said two parties in the manner thereinafter provided, and within the time thereinafter limited, then each of the parties thereto should vote his share of said stock at the first stockholders' meeting thereafter, as he individually saw fit; provided, each of the parties thereto pledged himself in such case to vote all his stock for the election of each of the parties thereto for director, or for so many of them as were then stockholders; and in case the said two parties so failing to agree with the other three, refused so to offer their stock to the said three, then the said three parties should control the voting of all of said 1,250 shares of said stock at the first meeting thereafter held; and each

of the parties thereto further pledged himself that he
would not pledge, encumber or sell his said one-fifth of said
stock during the said period of ten years, except in the
manner thereinafter set forth; it being the intention of
each of the parties thereto, and each of the parties there-
by agreed to keep his share in the said stock during the
said period, for the mutual benefit of himself and the other
parties thereto, so that they, the said parties, should not in
any manner lose the control and management of the prop-
erty of the said railway; that in case any one of the parties
thereto should at any time during the said period of ten
years, desire or be required, as above set forth, to dispose
of his one-fifth of said stock, then, if the said stock should
have a market value, he should offer his share of the same
to the other parties thereto, in writing, addressed to them
all, at said market price; and if the said market price were
not paid to him by the other parties thereto, or some one
or more of them in case all did not desire to purchase,
within thirty days after such offer, he should be at liberty
to sell the same to any one, and the same should in that
case be delivered to him.    If the said stock at said time
had no market value, the value of the same, on the day of
the said offer, should be agreed upon, and if no agreement
could be made, then the said value should be determined by
each party thereto writing his name and opposite thereto
his estimate of its value, not exceeding par, and one-fifth
of the sum of the five estimates should be agreed upon as
the value of said stock, and the same, unless said offer to
sell was withdrawn in writing, should be paid to the owner
thereof within thirty days of his said offer to sell the same,
by one or more of the remaining parties thereto in case all
did not desire to purchase, and in default of such payment
the same should be delivered to him and he should be at
liberty to sell the same to any one.

That in case it became necessary or expedient for less
than the whole number of parties thereto to pay more than
their proportion of the amount named in said notes, then
said parties so paying should have a specific lien upon the

interest or interests of the other, or others, in said stock or bonds, or both, as the case might be, to secure them for such payment in excess of their own shares of the debt evidenced by said notes, and such interest, or interests, in the said stock or bonds, or both, might be sold at the expiration of six months thereafter at its or their market value, if it or they should have a market value, and if not, then such value should be agreed upon, and if no agreement could be made, then such value should be determined by each party thereto writing his name, and opposite thereto his estimate, not exceeding par, of the value of said stock, or of said bonds, as the case might be, and one-fifth of the sum of said five estimates should be agreed upon as the value of the said stock or bonds, or both, as the case might be; and the said parties thereto so making the said payment or payments, should have the right, for a period of thirty days thereafter, to take the said stock or the said bonds, or both, as the case might be, at the price so fixed; and in case none of the said parties should take the same within said thirty days, then the same might be sold thereafter to any other party or parties, provided that the party or parties thereto owning said stock might redeem the same at any time before sale by paying the amount of the liens thereon to the party or parties entitled to the same.

The bill further avers that afterwards all said first mortgage bonds in said written agreement mentioned were sold to other parties, and all said promissory notes in said agreement mentioned, and the $6,000 provided to be paid to said DeMange, were fully paid and discharged, and 250 of said shares were fully paid for by complainant, and in pursuance of said contract said DeMange assigned to said Evans, McIntosh, Eddy and complainant, each 250 shares of said 1,250 shares of said stock subscribed for by said DeMange, as aforesaid; that after the sale of said bonds and the payment of said promissory notes, the said shares of stock, including complainant's said shares, were delivered to said DeMange, in the manner and for the uses and purposes recited in said agreement.

That in June, 1901, said DeMange, Eddy and Evans pur-
chased all the shares subscribed for by said Graham, and
also all the shares of said McIntosh, and released and dis-
charged said McIntosh from all liability and obligation
under and in connection with the said contract; that by
means of the purchase aforesaid, said DeMange, Eddy and
Evans became and still are the owners in equal parts of all
the stock of said railway except the stock of complainant;
that complainant had no knowledge of such purchase until
after the same was consummated, and did not participate
in any way in any of the proceedings by which such pur-
chase was brought about; that in the purchase of said stock
of said McIntosh, said DeMange, Eddy and Evans did not
require said McIntosh to offer his stock in the manner pro-
vided for by the terms of said written agreement, but
without any regard thereto, said McIntosh asked and was
paid for his said stock by said DeMange, Eddy and Evans,
$22,500 in the ordinary way of bargain and sale; that even
though the written agreement aforesaid had been binding
upon complainant in the matter of leaving control of his
shares in DeMange for the period of ten years, which he
does not admit, yet the release of said McIntosh from the
terms of said agreement, worked a discontinuance and an-
nulment of the trust, if any, under which the shares and
interest of your orator in said railway had theretofore
been held and controlled by said DeMange; that since the
release and withdrawal from said agreement by said Mc-
Intosh, the method provided therein for your orator to sell
or obtain personal control of his said shares and interest,
or to have a voice in determining how they shall be voted,
is destroyed and rendered impossible of operation.

That on February 1, 1902, when he was about to depart
from Bloomington, Illinois, to go to China, complainant
offered to sell his stock to said DeMange, Eddy and Evans,
or to either of them, but that although said stock was at
said time fairly worth ninety per cent. of its face value,
the highest offer he could obtain from any or either of said
persons, was twenty per cent. of such face value, which

offer your orator declined to accept; that in said attempted sale no regard was had to the method provided in said written agreement, as it was assumed by all concerned that it was no longer practicable to follow such method; that when it was found he could not agree with said DeMange, Eddy and Evans, or either of them, as to selling to them, or either of them, his said stock, complainant began negotiations, with their knowledge, consent and acquiescence, to sell his said stock to one Willson, but while such negotiations were pending, said DeMange, with a fraudulent design of preventing complainant from selling his said stock to said Willson, stated to said Willson that complainant was not the owner of any stock in said company; that he only had a contract interest in some of the stock, and would have to have the consent of all the parties to the syndicate contract to sell his interest, and that while he, DeMange, would not have any objection to said Willson's acquiring complainant's interest, he feared it might not be satisfactory to the other members of the syndicate, and that they might make it unpleasant for said Willson if he should buy complainant's stock, and that because of such statements and representations said Willson declined to purchase complainant's said stock.

That on February 6, 1902, on the eve of his departure for China, where he expected to be detained by business for a long time, in order to obtain his rights and protect his interest in said company, complainant appointed and empowered Thomas C. Kerrick, his attorney in fact, to demand and receive a certificate of his said 250 shares of stock; that on February 15, 1902, said Kerrick exhibited to said DeMange said power of attorney and verbally requested said DeMange to deliver to him, as attorney in fact for complainant, a certificate of said shares in complainant's name; that at that time said DeMange did not refuse to deliver such certificates, but asked for time to consider the matter; that from time to time thereafter said DeMange, still not saying whether or not he would deliver said certificate to said Kerrick, asked said Kerrick for further time

to consider the matter; that on March 28, 1902, said Kerrick, as attorney in fact, and also as attorney at law and agent for complainant, made demand in writing of said DeMange, individually, DeMange as president, Evans as secretary of said Railway, and the said Railway, forthwith to duly issue, or cause to be issued, to and in the name of complainant, in due and proper form, a certificate showing complainant's full and complete ownership of 250 shares of stock of said Railway, and that said certificate be delivered to said Kerrick; that said DeMange, said DeMange as president and said Evans as secretary of said Railway, and said Railway, refused, and still refuse, to comply with said demand, and said DeMange, as the nominal holder of said stock of complainant, asserts and exercises full control and management of said stock the same as if it were his own, and denies any right in complainant in any wise to control or direct in respect to his said stock, and asserts the right and declares his intention to continue in such course with regard to said stock.

That since the appointment of said Kerrick as his attorney in fact, and after notice to defendants of such appointment, the defendants, without notice to complainant, or his said attorney in fact, of any intention so to do, made a pretended and illegal increase of the capital stock of said Railway, from $250,000 to $600,000; that other than as to the fact that said alleged increase of capital stock was made without the knowledge or participation of complainant, or his said attorney in fact, complainant and his said attorney in fact were ignorant of the steps taken by defendants to make such pretended increase of stock, until May 6, 1902, when a certificate of the proceedings therein was filed in the recorder's office of McLean County, Illinois; that by his said attorney in fact, complainant has requested of said defendants leave to examine the records and books of said Railway, in so far as they relate to said alleged increase of capital stock, but such request has been refused by said defendants, and said defendants wholly refuse to furnish complainant, or his said attorney in fact, any information

whatever concerning said alleged increase of capital stock, other than a verbal statement that the capital stock of said Railway has been increased to $600,000, and your orator has no information other than as obtained from the records in said recorder's office.

That no certificate of the vote or proceedings by which said alleged increase of stock purported to be effected, was filed with the recorder of deeds of McLean County, Illinois, until nearly a month after such alleged vote was taken, and no notice of a meeting of the stockholders of said Railway to vote upon the question of increasing the stock of said company, or that said stock had been increased, was published in any newspaper, as required by the Statutes of Illinois, and neither complainant nor his said attorney in fact, in any way, received such notice, nor in any way assented or consented to such illegal increase of capital stock; that even though said written contract was and is valid and binding, which complainant does not admit, and that under the same the said DeMange had the right and power in pursuance of said contract, to vote complainant's said stock in said alleged proceedings to increase the capital stock of said company, which complainant does not admit, yet, under the said contract, complainant was and is entitled to direct, in writing, together with the other parties to said contract, how said DeMange shall vote said stock, and in order to exercise such a right, is entitled to notice of all meetings at which a vote of said stock is in contemplation. And well knowing this, said DeMange, Eddy and Evans, as individuals, and as president, manager and secretary, respectively, of said Railway, and sole owners of the stock of said Railway other than complainant's stock, unlawfully conspired and confederated together to prevent, and did prevent complainant from obtaining any knowledge concerning said increase of stock, or of any vote of his stock in that connection, until long after such alleged increase of stock had been made, and by reason of the premises, complainant alleges that said pretended increase of capital stock is invalid and void and that defendants cannot lawfully issue or cause

to be issued, any part of such alleged increase of capital stock, and that the same, if issued, will be invalid and void.

That after the filing of the original bill in this case, there was filed for record on the 6th day of May, 1902, in the recorder's office of said McLean county, a certain alleged certificate of a pretended and illegal increase of the capital stock of said Railway, from $250,000 to $600,000; that for the reasons hereinbefore stated, neither complainant nor his said attorney in fact, had any knowledge or information whatsoever concerning the manner in which said alleged increase of stock was made, until said alleged certificate was filed; that said purported action on the part of said defendants, was had and taken secretly and without notice of any kind whatsoever to complainant, or to his said attorney in fact, and the filing of said alleged certificate was delayed as above stated, for the space of almost a month, for the purpose and with the fraudulent intent of preventing complainant and his said attorney in fact from obtaining any knowledge or information of said purported action; that in and by said alleged certificate, said DeMange unlawfully represented himself as being the owner of and as having voted 1.666⅔ shares of said capital stock, when in truth and in fact 250 shares of said stock so claimed and alleged to have been voted by him, belonged to complainant, and were of right under control of him and his said attorney in fact.

That after the filing of his said original bill, there was filed for record, on the 6th of May, 1902, in the county recorder's office of said county, a certain alleged certificate concerning the "enlarging of the object" of the Bloomington Electric Light Company, a corporation organized and doing business under the laws of Illinois, hereinafter designated as the Electric Company; that said increase of the capital stock of said Railway, and said purported action concerning the enlarging of the object of said Electric Company, were taken and had by said defendants for the purpose of furthering and accomplishing a certain unlawful scheme or plan against the interest and desire of complainant, and without regard to his rights in the premises, which

said unlawful scheme and plan contemplated, among other things, the so-called consolidation of the said Electric Company with the said Railway.

That after the filing of his aforesaid original bill, there was filed for record, on May 10, 1902, in the county recorder's office of said county, two certain alleged certificates purporting to show certain alleged action on the part of the stockholders of said Railway, and of the said Electric Company, whereby the said Electric Company was "consolidated" with said Railway; that until the filing of said last mentioned certificates, neither complainant nor his said attorney in fact had any notice, knowledge or information whatsoever, concerning said alleged consolidation, and that no notice of the meeting of the stockholders of said Railway to vote upon the question of consolidating the Electric Company with said Railway, or that said purported consolidation had been effected, were published in any newspaper, as required by the Statutes of Illinois, and complainant never in any way received such notice, nor in any way assented or consented to such alleged consolidation; that said purported action on the part of said defendants was taken secretly and without notice of any kind to complainant or to his said attorney in fact, for the purpose and with the fraudulent intent of preventing complainant and his said attorney in fact, from obtaining any knowledge or information of said purported action; that in and by said alleged certificate of consolidation, said DeMange unlawfully represented himself as being the owner of and as having voted 1,666⅔ shares of the capital stock of said Railway, when in fact 250 shares of the said stock so claimed by said DeMange, and alleged to have been voted by him, belonged to complainant and were of right under control of complainant and his said attorney in fact.

That said Railway and said Electric Company were not, on said 5th day of May, 1902, nor had they been at any time prior to said date, "corporations of the same kind, engaged in the same general business;" that by means of the premises, and because of the facts hereinafter stated and

shown, said purported consolidation was and is invalid and void.

That said DeMange, who is, and was, at and before the time of the said alleged increase of the capital stock of the said Railway, and alleged consolidation of the Electric Company with said Railway, the president of both said companies, was the owner of the entire capital stock of said Electric Company, the one share voted, as aforesaid, by H. M. Kennedy, being in fact owned by said DeMange; that the aforesaid alleged increase of capital stock of said Railway was manipulated and brought about by said DeMange, and the said Evans and Eddy, who are wholly controlled and dominated by said DeMange as a part of a scheme to enable said DeMange to consolidate said Electric Company with said Railway, and to sell the property of said Electric Company to the said Railway at a fraudulently exorbitant price; that the price at which the property of said Electric Company was, under said scheme, sold and transferred to the Railway, is grossly and fraudulently excessive; that the said DeMange well knew that complainant would not consent to such sale and would oppose legal proceedings thereto if aware of such an attempt, and for that reason, with others, designedly and fraudulently, in conjunction with said Eddy and Evans, prevented complainant and his said attorney in fact from obtaining any knowledge of such proceedings until long after it had taken place.

That on May 31, 1902, after the filing of complainant's original bill and amended and supplemental bill herein, there was filed for record in the office of the recorder of said county of McLean, an instrument purporting to be a conveyance of the entire property of said Electric Company to said Railway, subject to all liens upon the same and all indebtedness due and owing by the grantor; that said instruments were so executed in pursuance of the fraudulent and collusive scheme aforementioned and described, and with a view to obtain by mortgage of the properties so consolidated, a large sum of money, ostensibly to be used for the exclusive extension, improvement and

betterment of the consolidated property and the payment of indebtedness upon the property existing prior to the alleged consolidation, but in fact to be used in large part for the payment to said DeMange of the fraudulently exorbitant price at which the property of said Electric Company was sold to said Railway, as aforesaid, and also for unlawful division between said DeMange, Evans and Eddy.

That on May 19, 1902, there was filed for record in the office of the recorder of said county of McLean, instruments showing an alleged change of name of said Railway to that of Bloomington & Normal Railway, Electric & Heating Company, and enlarging of the objects of said company so that it should have power to provide, lease and operate street railways, and to hold all franchises and property necessary therefor; to manufacture electric current and illuminating gas; to furnish for public or private use, any or all of the articles or commodities of light, heat and power, and to acquire, own, buy, sell and deliver generally all apparatus and appliances requisite or proper to be used for such purposes; that such proceeding was had without any notice whatsoever to complainant or to his said attorney in fact; that neither complainant nor his said attorney in fact had any knowledge of such proceeding until said filing of said instrument, and that said DeMange, Eddy and Evans fraudulently schemed and designed to prevent, and did so prevent, complainant and his said attorney in fact from knowing anything of such procedure until long after it was had.

That on June 22, 1902, there was filed for record in the recorder's office of McLean county, a mortgage upon all the property of the said Railway and the said Electric Company under the alleged name of the Bloomington & Normal Railway, Electric & Heating Company (hereinafter designated as the Consolidated Company), to secure $600,000 mortgage bonds of said date; that neither complainant, nor his attorney in fact, had any notice or knowledge of any of the proceedings relative to the giving of said mortgage, or that it was in contemplation to give such mortgage, until same was filed for record, as aforesaid; that said

DeMange, Eddy and Evans fraudulently schemed and designed to prevent, and did prevent, complainant and his said attorney in fact from obtaining any knowledge of any vote or other proceedings relative to the giving of such mortgage, until same was filed for record.

That $500,000 of said bonds were, on June 10, 1902, placed with the Thompson, Tenney & Crawford Company, a bond brokerage corporation doing business in Chicago, Illinois, for sale, under an arrangement by which it was to advertise and hold itself out to the world as the individual purchaser of said bonds, having them for sale as its own, but under which arrangement, in fact, said company held said bonds to be used merely as brokers for the mortgagor, but with power to raise money upon them for the mortgagor as collateral, and to sell said bonds as soon as practicable and repay itself the money so raised upon said bonds as collateral; that complainant is informed and believes and charges, that approximately $475,000 has been received by the mortgagor from the pledge and sale of said bonds, about $260,000 of which was applied directly by said brokerage company to the payment of a prior mortgage given by the Railway, and of the $215,000 balance, the major part has been, as complainant believes and charges, appropriated by said DeMange in payment for the property of said Electric Company, as aforesaid, and a part thereof in an unlawful division of the same between the said DeMange, Eddy and Evans, as aforesaid; that with the knowledge and consent and connivance of said mortgagor company, through said DeMange, Eddy and Evans, its president, manager and secretary, respectively, the Thompson, Tenney & Crawford Company, in a printed circular put in general circulation throughout the country, soliciting purchasers for a part of said bonds yet unsold, represent and set forth that the Bloomington & Normal Railway, Electric & Heating Company, comprises a consolidation which was effected early in June, 1902, of the Bloomington & Normal Railway, the Bloomington Electric Light Company, and the City District Heating Company

(hereinafter designated as the Heating Company), all of which companies are incorporated companies, incorporated under the laws of the State of Illinois; that both complainant and his said attorney in fact being refused access to the books and records of the said Railway and of any company alleged to have been consolidated with it, and of said alleged consolidated company, are in ignorance of what may have been done or attempted in the way of consolidation of said Heating Company with said other companies, other than as advised by said statement in said circular; that there is no record either upon the records of said county, or in the office of the secretary of state of the State of Illinois, of any consolidation of said Heating Company with said other two companies, or either of them; that no more than two incorporated companies can lawfully be consolidated in one, under the laws of the State of Illinois in respect to the consolidation of incorporated companies; that the publication and circulation of the circular aforesaid, is a fraud upon the public and complainant, and that it may, and probably will, involve said Railway in expensive litigation with the purchasers of said bonds under such misrepresentations, and may involve an action for the forfeiture of the charter of said company, at the suit of the State of Illinois, to the damage of complainant with respect to his said stock, and that the said Thompson, Tenney & Crawford Company and the said DeMange, Eddy and Evans should be restrained by injunction from further issuing and circulating said circular, or other circular and advertisement containing the representations aforesaid; that for the reasons aforesaid, complainant is in ignorance as to whether or not some sort of a pretended consolidation has been made by which the property of said Heating Company has been made a part of said consolidated company; that the said A. E. DeMange is the president and sole owner of said Heating Company. and complainant, because of the representations contained in aforesaid circular, has reason to believe, and does believe, and so charges, that said DeMange has made some sort of an unlawful sale or transfer of the

property of said Heating Company to the said Railway, or to said alleged Consolidated Company, in fraud of complainant's rights in the premises, and as to such transaction complainant expects to prove that such sale is in fraud of complainant's rights in the premises and void as to him.

That at the time when complainant endeavored to sell his stock, as aforesaid, and ever since, said DeMange, Eddy and Evans have unlawfully conspired and confederated together to prevent complainant from selling his said stock, or from having any voice or control with respect to it, and that they are now asserting and claiming that he has no interest or right whatsoever in said stock, or in said Railway consolidated with another or other companies; that said DeMange in particular, although admitting that he came into possession of complainant's stock as trustee for complainant with respect to said stock, now falsely and fraudulently claims to be the owner absolutely of said stock, upon a false and fraudulent pretense that complainant's stock was a gift from said DeMange to complainant; and, among other reasons for not delivering complainant's said stock to him or to his said attorney in fact, claims that said agreement between himself and complainant, whereby complainant is to receive said stock, is without consideration moving from complainant, and therefore, not enforceable against the said DeMange or against said Railway, or against said alleged Consolidated Company; that at the time and ever since the effort of complainant to dispose of his said stock, as aforesaid, it has been the settled and constant design and purpose of said DeMange, Evans and Eddy, to ignore all right of complainant in said Railway, and to prevent him from obtaining any knowledge whatsoever of any of the acts or business or plans of said Railway, or of themselves, or either of them, with respect to such acts or plans or business; that during all said time it has been the design and purpose of said DeMange, Eddy and Evans, and they have constantly acted and cooperated in the furtherance of such design and purpose, to " freeze out" complainant from his said interest in said Railway, or to force him

to sell his said stock to them, or some of them, for a nominal price; all of which has been, during all said time, well known to said Railway, and any and all incorporated company, or companies, combined or consolidated with said Railway, through the president and all other officers and stockholders, except complainant, of each and all of said companies; that each and all of said companies, by all the officers and stockholders of the same, excepting complainant, have, as companies, all along acted and cooperated with said DeMange, Eddy and Evans, in all the acts and doings aforesaid, in the furtherance of the fraudulent and unlawful designs and purposes aforesaid.

That as one of the means to render complainant's said stock worthless, or nearly so, and to force him to sell his said stock to the said DeMange, Eddy and Evans, or some of them, at a nominal price, or to abandon his interest in said Railway, said DeMange, Eddy and Evans, with the cooperation of said companies, through the control of said companies by said DeMange, Eddy and Evans, procured the mortgage aforesaid, to be made for an amount equal to or in excess of the entire value of the said mortgaged property, and diverted a large portion of the proceeds of the said mortgage to the payment of the fraudulently exorbitant price of the property of said Electric Company, and to an unlawful division between said DeMange, Eddy and Evans, as aforesaid, and by said means, if allowed to prevail, complainant's said stock would, in fact, be rendered practically valueless; that said diversion of the funds procured by means of said mortgage, is unlawful and is a fraud upon complainant.

That said Railway and the alleged Consolidated Company, being officered and owned entirely, except as to the interest of complainant, by said DeMange, Eddy and Evans, who are parties with complainant to the aforesaid written agreement, are charged with the full knowledge of all limitations upon the powers and rights of said DeMange, respecting complainant's said stock, and the disability of said DeMange to vote said stock in any meeting or proceeding

of said Railway in disregard of complainant's voice and vote as to how his said stock shall be voted, and without notice to complainant that said stock is to be voted, and that being so charged with the knowledge, the acceptance by said Railway of said vote of said DeMange, with respect to the alleged increase of the capital stock of said Railway, the alleged consolidation, the alleged change of name, and the giving of said mortgage or issuance of said bonds, was and is illegal and void, and of no effect as respects complainant's rights in the premises, and all said alleged acts are void and of no effect.

That said Railway and said Electric Company were not, at the time of said alleged consolidation, and never were, corporations of the same kind, engaged in the same general business; that the franchise granted to said companies by the city of Bloomington and town of Normal, the place of their operation, are entirely distinct and different; that the franchises, and only franchises, granted to said Railway, appertain to street railways only; that those granted to the Electric Company appertain to the furnishing of light only, and that neither of said companies has any franchise other than those granted by said city and said town to said Railway, and those granted to said Electric Company by said city; that said alleged proceedings by which it is pretended that the powers of said Electric Company are enlarged so as to give said company the character and functions of a street railway company, were not had in good faith with the honest and lawful intention of enabling said Electric Company to own and operate street railway, or railways, but were had solely and only for the purpose of giving a colorable right of consolidation to two companies entirely dissimilar in fact and in the meaning of the law concerning the consolidation of incorporated companies, and to further the aforesaid unlawful scheme of said DeMange to sell the property of said Electric Company to said Railway.

Said DeMange, DeMange as president of the Bloomington & Normal Railway, J. F. Evans, J. F. Evans as secretary

of the Bloomington & Normal Railway, John Eddy, the Bloomington Electric Light Company, the Bloomington & Normal Railway, Electric & Heating Company, The Thompson, Tenney & Crawford Company, and the City District Heating Company are made parties defendant to said bill, which prays that said defendants, A. E. DeMange, A. E. De-Mange as president of the Bloomington & Normal Railway, J. F. Evans as secretary of the Bloomington & Normal Railway, and the Bloomington & Normal Railway, be decreed to issue to complainant, in due and proper form, a certificate showing his full and complete ownership of 250 shares of the original capital stock of said Railway, and that they cause to be made, upon the records of the said Railway, entries so as to show fully the complete and effectual transfer to complainant of all title to said 250 shares of the capital stock, and the complete divestiture from said De-Mange, of all interest therein or control thereof, and that they deliver such certificate to complainant, or to his said attorney in fact; that the aforesaid written contract between said DeMange and complainant and said Eddy, Evans and McIntosh, be decreed to be of no further binding force or effect as to complainant, or as to the control of complainant's said stock or interest by said DeMange; and that the alleged proceedings aforesaid relative to the alleged increase of the capital stock of said Railway, and shares of such increased stock issued, or that may be issued, the pretended consolidation of the said Electric Company with the said Railway, and alleged proceedings by which the name of said Railway is pretended to have been changed, be decreed to be null and void; and that the said DeMange and the said Electric Company be decreed to repay and return to the said Railway the proceeds received by the said DeMange or the said Electric Company, in consideration of the said alleged transfer and sale of the property of said Electric Company to said Railway; that an accounting may be had to ascertain the amount and kind of such consideration paid or agreed to be paid, and that any agreement to pay any part of such consideration that may yet remain unpaid, be decreed to be

null and void. The bill further prays that in the alternative, if it shall be held that the said increase of the capital stock of the said Railway, and the said alleged consolidation of the said Electric Company shall stand, then in that case, that it be decreed that an accounting shall be had to ascertain the fair and reasonable value of all the property received by the said Railway by means of the said consolidation at the time of the transfer of the same, and what consideration was in fact paid for said property, and that to the extent that the amount in fact paid shall be found to exceed the fair and reasonable value of said property, the said De-Mange and the said Electric Company shall be decreed to repay into the treasury of the said Consolidated Company; and that an accounting may be had to ascertain how much money has been received by the mortgagor from the sale or hypothecation of the $600,000 of mortgage bonds aforesaid, and how much of the money so realized has been applied to the improvement, extension and betterment of said mortgage company, and to the payment of the *bona fide* antecedent indebtedness of said company, and how much thereof has been unlawfully appropriated by said DeMange, Eddy and Evans, as individuals, and that the said De-Mange, Eddy and Evans may each be decreed to repay into the treasury of said company the sum that may be found to have been so unlawfully appropriated by him; that the said Consolidated Company issue a certificate in due and proper form, showing complainant to be the owner of 600 shares, or one-tenth of the capital stock of said Consolidated Company, and that said company be decreed to deliver to complainant or to complainant's attorney in fact, Thomas C. Kerrick, the same; that said Consolidated Company, said DeMange, said Evans and said Thompson, Tenney & Crawford Company, be restrained by injunction from advertising and representing that said Consolidated Company comprises "a consolidation of the Bloomington & Normal Railway, the Bloomington Electric Light Company, and the City District Heating Company."

And if it shall be discovered there has been a sale, or an

attempted sale of the property of the said Heating Company to the said Railway, or to the said Electric Company, or to the alleged Consolidated Company, under color of consolidation with either or both of said companies, or otherwise, that the said sale be decreed to be null and void; that the said DeMange and the said Heating Company be decreed to repay to the said Railway whatever consideration has been received by said DeMange, or by said Heating Company, from the said Railway; or in the alternative, that an accounting be had to ascertain the fair and reasonable value of the property of the said Heating Company, at the time of such sale of its property, and that if upon such accounting it shall be found that the consideration received by said DeMange, or the said company, for said property, was excessive, then, that the said DeMange and said company be decreed to repay into the treasury of said Consolidated Company, whatsoever sum may be shown upon such accounting to have been received by said DeMange, or said Company, for said property, in excess of the fair and reasonable value of the same.

The grounds of demurrer assigned are, first, that complainant has complete remedy at law; second, that the bill is multifarious, in that it seeks to litigate two or more distinct and independent matters in one suit; third, that the bill is devoid of equity; fourth, that complainant relies upon alleged written contract in some portions of the bill, while in other portions denies or refuses to admit its binding force; fifth, that it appears from face of bill that there are necessary and indispensable parties not joined; sixth, that the bill pleads evidence and conclusions; and seventh, that there is no privity between the complainant and defendants DeMange and Evans, as president and secretary, respectively, of the Bloomington & Normal Railway, to enable complainant to call upon said defendants for the relief prayed.

KERRICK & BRACKEN, for appellant.

BARRY & MORRISSEY, JOHN T. LILLARD and SHOPE, MATHIS, ZANE & WEBER, for appellees.

MR. JUSTICE PUTERBAUGH delivered the opinion of the court.

The general inquiry presented by the various demurrers interposed thereto is, whether the bill here involved states grounds for equitable relief. The primary question to be determined is as to the validity and force of the contract set out in the bill. Appellant urges and argues that the provisions of the same whereby the stock of the Railway Company was to be placed in the hands of one of the contracting parties in trust for the others, for a period of ten years, to be voted as a unit at all stockholders' meetings, upon all questions, as four-fifths of the parties thereto should direct in writing, is in restraint of trade and therefore contrary to public policy and void.

In Faulds v. Yates, 57 Ill. 416, where persons owning the majority of the stock of a corporation entered into an agreement that they would elect the directors and determine among themselves as to its officers and management, and that if they could not agree, they would ballot among themselves for the directors and officers, and that the majority should rule, and their vote be cast as a unit, so as to control the election, our Supreme Court held that such an agreement was not void as against public policy and that the parties had a right to combine and thus secure the board of directors and the management of the company. This case was cited, with approval, in Higgins v. Lansingh, 154 Ill. 301.

In Smith v. S. F. & N. P. Ry. Co., 115 Cal. 584, an agreement similar to the one in question, was fully considered by the court and held to be a valid and binding contract. In that case three parties intending to purchase a block of stock entered into an agreement as one of the conditions of their uniting in the purchase, that they would vote as a unit for five years, in accordance with the decision of the majority, to be determined by ballot. It was there held

that an owner of stock cannot revoke an agreement made with other persons as a condition of their joining to purchase a majority of the stock, although the certificates were taken in their individual names, to the effect that the stock shall be voted as a unit for five years as a majority of them should determine by ballot. It was also held that the owners of the majority of stock may lawfully agree to be bound by the will of the majority of themselves in voting the stock, and that the agreement was not illegal as in restraint of trade.

In Moses v. Scott, 84 Ala. 608, certain stockholders had formed a voting trust and placed their stock in the hands of four trustees with power to vote the stock as a unit at all meetings, as three of them should think best, or if they failed to agree, as three-fourths of the stock represented should determine, and agreed not to sell their stock so pooled for a period of three years. In that case there was no consideration other than the mutual promise of the several stockholders, and while the court refused to enforce the agreement, it said: "We cannot say there is anything *per se* illegal, in an agreement entered into by and between certain stockholders in a joint stock company, by which they promise to vote together as a unit in all matters pertaining to the government of the corporation. Each member has a clear right to cast his ballot as he pleases, wisely or unwisely, and no other stockholder can control his conduct, or gainsay his discretion. And it can make no difference if several stockholders uniformly vote together, or so vote in obedience to a prior agreement that they will do so. The vote when cast is but the expressed wish of the stockholders, or, at least, must be so regarded, and no other stockholder can be supposed to be injured thereby. To hold otherwise would greatly abridge the voter's right to cast his ballot as he pleases."

In Hey v. Dolphin, 92 Hun (N. Y.), 230, the parties were jointly interested in certain shares of stock which had been issued to them in a single certificate, and it was agreed between them that the stock should not be sold or in any

manner disposed of, for a period of ten years, without their joint consent in writing, but should remain as first issued, for the purpose of enabling said parties to prevent the control and management of the company from passing over to persons who might be less qualified to make the business a success and its stock valuable. By the same agreement Dolphin was appointed a proxy to vote the whole of said shares at all regular elections and the proxy was made irrevocable for ten years. In an action brought for the purpose of having the agreement made void and to have a certificate issued to the plaintiff for one-half of the shares, the court held that the agreement was not void or against public policy, saying: "The object and purpose of the agreement as stated in the contract is not in itself vicious, but rather the contrary. It will hardly be claimed that a majority of stockholders may not combine and control an election of directors."

In Beach on Corporations, section 304, it is said: "The owners of shares may enter into agreements as between themselves, to elect the officers of the company and to manage its officers as they or a majority of them may determine, and it is held that agreements of that character are not illegal or void as against public policy, for as was said by the court in a leading case (Faulds v. Yates, 57 Ill. 416), their interests are identical with the interest of the minority of the shareholders."

The purposes sought to be accomplished by the provision of the contract under consideration, was to vest and retain for a fixed period the management and control of the enterprise in the persons who originally promoted the same. So long, at least, as each of them retained his original interest and no other rights intervened, the enforcement of the same was proper and practicable. We, therefore, hold that the provision of the contract in question was legal and valid. While "trust voting agreements" have been held to be void, the reasons therefor do not exist in the instant contract.

In Kreissl v. Distilling Co., 47 Atl. (N. J.) 417, the agree-

ment involved was held to be contrary to public policy and void for the reason that it provided for a possible manage-ment of the affairs of the corporation during a fixed period, by the judgment and determination of others than the stock-holders, and for the further reason that stockholders who joined therein should have an interest which would not inure to the benefit of those who failed to do so. The court there said: " If stockholders, upon consideration, determine and adjudge that a certain plan for conducting and managing the affairs of the corporation is judicious and advisable, they may, by powers of attorney, or the creation of a trust, or the conveyance to a trustee of their stock, so combine or pool their stock as to provide for the carrying out of the plan so determined upon. But if stockholders combine by either mode to intrust and confide to others—the formula-tion and execution of a plan for—the management of the affairs of the corporation, and exclude themselves by acts made and attempted to be made irrevocable for a fixed pe-riod, from the exercise of judgment thereon, or if they re-serve to themselves any benefit to be derived from such a plan, to the exclusion of other stockholders, who do not come into the combination, then, such combination, and the acts done to effectuate it, are contrary to public policy, and other stockholders have a right to the interposition of a court of equity to prevent its being put into operation."

In Cone v. Russell, 48 N. J. Equity, 208, an agreement was held void as against public policy by which owners of shares agreed with the owners of other shares to give an irrevocable proxy for five years, empowering them to vote on the shares during that time, in consideration of which the latter parties agreed to so hold the shares as to pro-cure the employment of one of the owners thereof as man-ager of the corporation, at a specified salary.

In White v. Tire Co., 52 N. J. Eq., 178, all the stock-holders of a corporation entered into an agreement among themselves, transferring their shares to a trustee, who should issue to each stockholder an assignable trust certifi-cate for the amount of his stock so transferred. The trus-

tee was required so to vote upon the shares that a majority of the directors should be elected on the nomination of holders of certain certificates, being a minority of the whole number, and that a minority of the directors should be elected upon the nomination of holders of certain certificates, being a majority of the whole number of such certificates. This agreement was held void. In its opinion the court says: "The conclusion does not reach so far as to necessarily forbid all pooling or combining of stock, where the object is to carry out a particular policy with a view to upholding the best interests of all the stockholders. The propriety of the object validates the means, and must affirmatively appear."

In Warren v. Pim, 55 Atl. Rep. (N. J.) 66, the American shareholders of a New Jersey corporation agreed to the plan of reorganization on the pledge that they should have an equal footing with English stockholders, who constituted the majority. The foreign stockholders, without the knowledge of complainants, created a voting trust to endure for fifty years, during which time the trustee was to have absolute power to vote the stock, subject to revocation of the trust by three-fourths of the stockholders. The result was the control of the corporation by one-seventh of its stock. It was held that the American shareholders could enjoin the carrying out of the trust, they having a right to demand the original judgment of all stockholders in the company, of the company's affairs. The court held that the creation of a pool with iron-clad provisions, and without the knowledge or consent of complainants, gave the defendants an unfair and unjust advantage, depriving complainants of the right to offer to and have the benefit of the individual judgment of the foreign stockholders on any and all matters connected with the policy of the corporation.

It is further urged that the contract is invalid for the want of a consideration. The position is untenable. Not only may a consideration be imported from the fact that the contract was under seal, but an express consideration

appears from the averments of the bill that each contract-
ing party agreed to and did pledge his personal credit and
financial responsibility for the payment of a portion, at
least, of the funds raised for the financing of the enterprise.
We are, therefore, of opinion that the contract was valid
and effective when made, and that under the terms thereof,
appellant became the owner of a one-fifth interest in the
capital stock of the Railway Company, subject to the terms
of said contract.

We are further of opinion that the acquirement by De-
Mange, Eddy and Evans of the McIntosh interest, in the
manner averred, was such a clear and so obvious a de-
parture from the mode of procedure provided thereby to be
adopted, as to operate as a rescission, by them, of the con-
tract, and to render the provisions of the same, so far as a
trust is reposed in DeMange, thereafter inoperative and
without force, and to deprive DeMange as trustee of any
further right to hold or control appellant's stock. Further-
more, such disregard by DeMange of the terms of his trust,
coupled with his subsequent conduct, constituted, in effect,
a denial of appellant's rights in the premises, and con-
sequently a breach thereof. It follows from the views ex-
pressed, that upon the violation of the contract by the other
parties thereto, the trust arrangement was *ipso facto* inef-
fective, and that as a consequence appellant became and
was entitled to demand, receive and control the shares of
stock issued to him in the first instance, free from and un-
hampered by the terms and conditions of the contract in
question.

Appellees insist that the averment of the bill to the ef-
fect that the purchase by McIntosh was effected in June,
1901, and the failure of appellant to aver a request by him
to be allowed to participate in the benefit of the same, or
that he complained thereof, until the filing of his bill in
April, 1902, show such laches as to estop him from com-
plaining of such violation of the terms of the trust, or in-
sisting that the contract in that particular was rescinded.
We regard such contention as without merit. A court of

equity will apply the doctrine of laches in denial of relief only where, from all the circumstances, to grant the relief to which the complainant would otherwise be entitled, will presumptively be inequitable and unjust because of the delay. Coryell v. Klehm, 157 Ill. 462.

In the light of the views already and hereinafter expressed, we are unable to say that by the delay of appellant in asserting his right to the unhampered control of his stock it may fairly be presumed that appellees were lulled into doing that which they would not have done, or in omitting to do that which they would have done in regard to the property, had such right been more promptly asserted. Gibbons v. Hoag, 95 Ill. 45.

The contention of appellant that because neither he nor his attorney in fact were notified of the several meetings of the stockholders at which the name of the corporation was changed, the objects enlarged, the capital stock increased and the consolidation with the Electric Company had, all of such proceedings were null and void, is equally without force. It does not appear from the averments of the bill that appellant ever was a stockholder of record. If not, he was never entitled to vote at any stockholders' meetings. The bill further shows that the meetings referred to were held under written waivers of notice, signed by all the stockholders of record. The statute was thus substantially complied with. We, therefore, hold that the averments of the bill in this respect are insufficient to warrant a decree declaring the proceedings at the stockholders' meeting referred to, null and void, and the same must, in this case, be held to be valid.

We think the averments of the bill are sufficient to entitle complainant to a decree declaring the contract in question, in so far as it provides for the control of his said stock by DeMange, to be of no further binding force and effect, and requiring said DeMange to transfer to complainant such number of shares of the stock of the Bloomington & Normal Railway, Electric & Heating Company, as it may appear, upon an accounting by said DeMange with

him, complainant is, in equity, entitled by reason of his ownership of said 250 shares of stock in the Bloomington & Normal Railway. As to the other and further relief prayed, we are of opinion that the bill in its present form is insufficient to entitle complainant thereto.

The averments of the bill to the effect that the property of the Electric Company and the Heating Company were turned into the Consolidated Company at excessive and exorbitant valuations, are clearly insufficient to warrant the relief predicated and prayed thereon, even if such relief could be had in this proceeding. They neither state what the property was worth nor the amount paid for the same. This is also true as to the averment that the consolidation of the Electric and Railway companies was unlawful, for the reason that they were not of the same kind and engaged in the same general business, which, in the absence of any averments as to the kind of business in which said corporations were respectively engaged, are but conclusions of the pleader.

It is urged that the bill is multifarious. By multifariousness in a bill is meant the improper joining in one bill distinct and independent matters, and thereby confounding them; one example of which being the demand in one bill of several matters of a distinct and independent nature against several defendants in the same bill. The objection is confined to cases where the case of each particular defendant is entirely distinct and separate in its subject-matter, from that of the other defendants, for the case against one defendant may be so entire as to be incapable of being presented in several suits, and yet some other defendant may be a necessary party to some portion only of the case started. In the latter case, the objection of multifariousness could not be allowed to prevail. So, it is not indispensable that all the parties have an interest in all the matters contained in the suit; it will be sufficient if each party has an interest in some matters in the suit, and they are connected with the others. Story's Eq. Pl., sec. 271. When the subject of a suit is single, but different persons

have, or claim, separate interests in distinct or independent questions, all connected with or arising out of the single object of the suit, the complaint may bring such different persons before the court, as defendants; so that the whole object of the bill may be obtained in one suit, and to prevent further unnecessary and useless litigation. Story's Eq. Jur., sec. 534, note. Applying the foregoing rule to the case stated in the bill under consideration, we are of opinion that the same is not multifarious.

The contention that appellant has a complete remedy at law by an action against DeMange for breach of an executory trust, is, in view of what we have said, so clearly untenable as to require no discussion.

The contention that the bill is demurrable because the complainant relied upon the contract in some parts of the bill and denies or refuses to admit its validity and binding force in others, is likewise without force. While a complainant is not allowed to allege two inconsistent states of fact and ask relief in the alternative, he may state the facts and ask alternative relief according to the conclusions of law which the court may draw from them. Story's Eq. Pl., sec. 42, note. A bill in chancery may be formed with a double aspect and the prayer thereof be in the alternative, so that if the chancellor shall decide against the complainant in one view it shall grant him the relief in another. And this is true though the different aspects presented be not consistent each with the other, if each alternative case made by the allegations of the bill entitles complainant to the relief asked by the prayer. Henderson v. Harness, 184 Ill. 520.

A number of other grounds of demurrer are urged. Those which we deem material or important are fully covered by the foregoing discussion.

There being equity in the bill, the chancellor erred in sustaining a demurrer to the same for want of equity. Where a bill in equity sets out various claims to the interposition of the court, a general demurrer to the whole bill will be overruled if any of the claims afford a proper case

for the jurisdiction of the court. Snow v. Counselman, 136 Ill. 191.

The decree of the Circuit Court will be reversed and the cause remanded for further proceedings not inconsistent with the views herein expressed.

*Reversed and remanded.*