JOHN L. BRIDGERS v. THE FIRST NATIONAL BANK ET ALS.

(Filed 6 April, 1910.)

1. Corporations—"Voting Trusts"—Public Policy—Void.

   A "voting-trust" agreement which, under certain conditions respecting the sale of stock, giving the trustees option of purchase at the book value, etc., provides for the transfer of the controlling vote of the shares of stock in a National bank to its president, vice president and cashier, for a term of fifteen years, in order to control the management of the bank for that period, is held void as against the public policy of this State, there being no controlling decisions of the United States courts on the subject.

2. Corporations—"National Banks"—Trusts and Trustees—Officers—Proxies—Void.

   A "voting trust" of a majority stock vote in the shares of a National banking corporation, naming the president, vice president, and cashier as trustees, is directly violative of the provisions of the United States Revised Statutes, sec. 5144, prohibiting these officers to vote as proxies; and, also, of Revisal, sec. 1184, relating to the election of officers by the stockholders present in person or by proxy, and that no proxy may be voted more than three years from its date.

   BROWN, J., dissenting.

APPEAL from *Cooke, J.,* heard at chambers, in Vance County, 8 October, 1909, by consent, in an action arising in EDGECOMBE.

This was a civil action instituted in the Superior Court of Edgecombe County, on motion to continue the restraining order issued. His Honor continued the restraining order and enjoined the defendants from putting the agreement hereinafter stated into effect, or taking any action thereunder. It was admitted that the First National Bank of Tarboro was duly organized under the National banking act, and was conducting a general banking business as authorized by law; that plaintiff is a stockholder in the bank; that the defendant Holderness is president, Johnson vice president and Pennington cashier of the bank; that the bank was organized in the fall of 1906, and the above named have been its officers since its organization; that the stock in the bank is held by many persons, distributed among the business men of Tarboro; that its business has been

well managed and the bank has been prosperous; that on 2 March, 1909, certain stockholders of the bank, among them the defendants, anticipating that one Henry Clark Bridgers was attempting to acquire the control of the stock in the bank, entered into the following agreement:

"Memorandum of an agreement made this 2 March, 1909, between certain stockholders of the First National Bank of Tarboro, hereinafter specifically named and designated, and George A. Holderness, C. A. Johnson and Ed. Pennington, trustees and attorneys with power:

"Whereas the First National Bank of Tarboro, a National bank organized under the banking laws of the United States of America, is engaged in conducting and carrying on the business of a National bank at Tarboro, N. C.; and

"Whereas the management, direction and control of said institution has at all times to this date been satisfactory to the undersigned and in conformity with the laws of the United States and State of North Carolina; and

"Whereas we, the following, represent and own the number of shares in bank, certificate number or numbers, which are set opposite our names, viz. (reciting names, certificate numbers, and numbers of shares of the subscribers, amounting to 269 shares out of a total of 500);

"Whereas we and each of us desire to have for a period of fifteen (15) years from and after the date of this instrument the continuance of the conditions above set out, and to assure ourselves and each other that these conditions and this *régime* will not be disturbed or affected by the act of any one of us, except as hereinafter provided for; and

"Whereas, in order to effect our purpose here and guarantee each to the other good faith in the performance of the conditions and agreement hereof, we and each of us have agreed to transfer our respective shares of stock to George A. Holderness, C. A. Johnson and Ed. Pennington, trustees named above, for the purposes and with the objects and intents herein declared:

"Now, therefore, this agreement witnesseth: That we (reciting names, certificate numbers and numbers of shares held by each subscriber) *do hereby sell, set over, assign and pledge* our respective shares of stock as named and described above to the said George A. Holderness, C. A. Johnson and Ed. Pennington, and their successors, on this special trust and for the uses following, to wit:

"First. The said trustees herein named are hereby given and clothed with the full power and authority during and for the term of fifteen (15) years next succeeding, upon the execution

and delivery of this agreement, to vote said shares and certifi-
cates of stock at all stockholders' meetings, and for that pur-
pose and to that end we and each of us do hereby appoint, name
and designate the said George Holderness, C. A. Johnson and
Ed. Pennington, and their successors, our true and lawful attor-
neys, for us and in our names during said period, to vote said
stock and fully represent us in all meetings, whether regular or
called, of the stockholders, giving and granting unto our said
attorneys full power and authority to do and perform all and
every act and thing whatsoever requisite and necessary to be
done in and about the premises, as fully to all intents and pur-
poses as we might or could do if personally present.

"Second. In the event that any of the stockholders hereto
signing shall desire to pledge his stock as collateral for a loan
or to sell and assign the same absolutely, then and in that event
we do hereby bind ourselves and agree to give and do hereby
give to said trustees above named and appointed, and to their
successors, *the right, option and privileges, if they shall so elect
and desire,* to sell for us and in our names and to transfer upon
the books of the company the certificate or certificates of stock
held by us, to such purchaser or purchasers as they or their
successors shall furnish or procure: *Provided, always,* that the
price by said trustees to be had and obtained for said certificate
of stock shall be the book value of the same at the time said
sale, pledge or transfer is attempted to be made, said trustees
agreeing to take same at book value. For that purpose and to
that end we do further appoint said trustees and their successors
for a like period of fifteen (15) years our lawful attorneys, for
us and in our names, to sell, transfer upon the books and deliver
our said stock, receive for our use and benefit the price thereof,
and to do all other acts and things in the premises that may be
necessary to fully and legally effectuate and carry out the pur-
pose hereof.

"Third. Contemporaneously with the signing, sealing and de-
livery of these presents the several shares of stock subscribed
above and hereby transferred are to be assigned and transferred
in blank, according to form on the back of each certificate or
certificates, and delivered into the custody of said trustees, who,
at the time that the said stock is delivered to them, shall execute
and deliver to the persons transferring and surrendering the
same, receipts showing the serial number, certificate and num-
ber of shares so transferred and delivered to them by each
person.

"Fourth. If a vacancy shall occur during the term of fifteen
(15) years herein fixed in the board or number of trustees here-

in named, either by death, resignation or the removal from the State of either one of the three named, then the trustee or trustees remaining shall have and they are hereby clothed with full power and authority to fill the vacancy or vacancies so caused, by appointing in the stead and place of the trustees or trustee so dying, resigning or removing the other trustees or trustee to succeed to the rights, powers, trusts and responsibilities herein given, imposed and declared in favor of the said Holderness, Johnson and Pennington, and such successor or successors are hereby given like power with the original trustees herein named, and will hold the shares of stock hereby transferred in like plight and condition as do the three original trustees herein named.

"Fifth. That this agreement shall be binding and obligatory upon each and every of the subscribers hereto, and the said stock hereby undertaken to be transferred and delivered to the trustees shall remain in their custody and possession under the conditions and for the purpose herein declared for a period of fifteen (15) years from and after the date of this instrument: *Provided, nevertheless,* that the said agreement may be earlier rescinded and made nugatory by the unanimous vote and agreement of the several signers thereof.

"In witness whereof, the above-named stockholders have hereunto set their hands and affixed their several seals, this the day and year written above. (Signed under seal.)"

"We do hereby accept the certificates of stock transferred to us, upon the trusts, terms and provisions set forth in the above paper-writing. "GEO. A. HOLDERNESS,

"C. A. JOHNSON,

"ED. PENNINGTON,

*"Trustees and Attorneys in Fact."*

It is further admitted that the trustees executed to each of the subscribers to said agreement a receipt or certificate in the following words:

"Received of . . . . . . . . . . . Certificate No. . . . . for shares of stock in the First National Bank of Tarboro, the same being assigned, transferred and delivered to us and held by us, under and according to the terms and provisions of an agreement made the second day of March, 1909, between certain of the stockholders of said bank and the undersigned. This the . . . . of March, 1909."

The plaintiff alleged that the "said agreement is in violation of his rights and the rights of the other stockholders, and is in law void and of no effect, in that it seeks, in advance of the

meeting of the stockholders, to fix the control of the stock of the bank, so that no argument, reason or persuasion on the part of the minority stockholders can or shall have any effect in any of the meetings of said stockholders, etc."

The defendants allege the following as the intent, purpose and justification of said agreement: "4. That the only object and purpose of the. said paper-writing were, first, as long as the stock represented in and by said paper-writing remained the property of him who signed the agreement, to hold together enough of the stock to protect the bank and the stockholders thereof against injurious, menacing and sinister designs of the said H. C. Bridgers, and to assure the continued prosperity, welfare and success of the institution; and, second, that whenever any owner of any share of said stock should desire to pledge the same as collateral for a loan, or to sell and assign the same absolutely, then to give to the trustees and attorneys named and appointed, and to their successors, the right, option and privilege to sell for said stockholder and in his name to transfer upon the books of the bank, the certificate or certificates of stock held by him to such purchaser or purchasers as said trustees and attorneys, or their successors, should furnish and procure, with the express provision, always, that the price by said trustees to be had and obtained for said certificates of stock should be the book value of the same at the time the sale, pledge or transfer should be made; the said trustees agreeing to take the stock at its book value.

"In respect of its first primary object of the agreement, these defendants say that each and every one who signed the said agreement, at the time of signing the same, were fully informed and knew, and these defendants know, that the effect of the said agreement, so far as it attempted to clothe the trustees named with the power to vote the stock at corporate meetings, was but a simple voting pool, the legal effect of which was to empower said trustees to vote the shares of stock deposited with them at all meetings of the stockholders of the said bank, only when the beneficial owner thereof should fail to attend and demand the right to vote the same in person, it being perfectly understood at the time that the trustees named in said paper, at any meeting at which any subscriber to said paper should be present, if the stock of such subscriber were not voted personally, it should be voted by the trustees as said stockholder desired and directed, and that only in the event of the failure of said stockholder to attend a meeting and vote in person, or to attend the meeting and direct the trustees how to vote, should the trustee vote said stock according to their judgment and opinion. And these de-

fendants solemnly aver that all of the parties to said agreement were so informed and so understood the same, before subscribing their names thereto, and subscribed the same expressly upon such agreement.

"In respect of the second object sought to be accomplished, to wit, that of giving a primary right of option to said trustees, these defendants say, recognizing the fact that so long as the owner of a share of stock remained its owner, he had the legal right to vote it in person, if he so elected; but anticipating that a contingency might arise which would compel some such owner to part with the stock, either by sale or by hypothecation, the said stockholders signing the said contract solemnly agreed one with another, that because the life and success of the bank and the interest of the small stockholders therein were imperiled by the persistent attempt on the part of the said H. C. Bridgers to acquire control, in the event any one of them found it necessary to sell his or her holding, gave to the trustees named, acting for their associates, a first right of purchase of said stock. In order to safeguard the rights and interests of him or her who might be impelled by necessity to part with said stock, it was, on the other hand, pledged by the trustees, acting for their associates, that such stockholders should receive for his or her stock not only its market value, but its book value, which these defendants allege is, under normal conditions, always a few points in advance of the market value."

The defendant appealed from the order of the judge making the injunction perpetual against the defendants.

*Aycock & Winston* for plaintiff.
*F. S. Spruill, H. A. Gilliam, W. W. Clark* and *L. V. Bassett* for defendants.

MANNING, J. The defendants' counsel frankly concede that the judge below was correct in his ruling, unless we now modify the doctrine announced by this Court in *Harvey v. Imp. Co.,* 118 N. C., 693; *Bridgers v. Staton,* 150 N. C., 216; *Sheppard v. Power Co.,* 150 N. C., 776. We have, therefore, re-examined the question presented with great care, and have reached the conclusion that the principles controlling the decision of those cases above cited are wise, salutary and make for the better management of corporate bodies.

The "voting-trust" agreement presented in the present case is in contravention of a wise public policy, opposed, in our opinion, to a proper construction of the Federal statutes governing the management of National banks, and is invalid.

In the absence of a decision of the Supreme Court of the United States which would be controlling upon us, we are constrained to determine the validity of the agreement by the principles heretofore declared by this Court and which we find to be in accord with the well-considered opinions of other courts, and with a proper construction of the Federal statutes.

This agreement confers upon the trustees and their successors the uncontrolled power of management of the bank for fifteen years; the unrestricted power of filling vacancies in their number; it accomplishes the complete separation of the legal and equitable ownership of the stock; it confers an irrevocable grant of representation by proxy for the term; its sole consideration is the mutual promises of the subscribers; it is uncoupled with any interest; and by it, the subscribing stockholders, owning a majority of the stock of the bank, strip themselves of their power to vote and to participate in the annual meetings of the stockholders, at which directors are elected, and to formulate and determine the policy of the bank. Those who are attempted to be entrusted with these large powers are the president, vice president, and cashier—persons forbidden by section 5144, Rev. Stat. U. S., to act as proxies, and the avowed purpose, to quote the words of the agreement, is that "we and each of us desire to have, for a period of fifteen years from and after the date of this instrument, the continuance of the conditions above set out, and to assure ourselves and each other that these conditions and this *régime* will not be disturbed or affected by the act of any of us, except as hereinafter provided (to wit, unanimous consent)." The surrender of their duties by the stockholders to their proxies is complete. No limitation is placed upon the trustees named in selecting other trustees to fill any vacancy that may occur, no stipulation that the subscribers to the agreement shall be consulted, no power reserved in them to be used except by unanimous consent. "The power is absolute in the trustees to do as they see fit, and any instructions from the majority of stockholders would be useless."

In *Warren v. Pim,* 66 N. J. Eq., 353, *Judge Pitney,* in a well-reasoned and elaborate opinion, considers these voting-trust agreements in every point of view. At p. 378 he says: "I base my view that an irrevocable voting trust, or any other irrevocable grant (uncoupled with an interest) assuming to confer upon the donee the power to vote at corporate elections for the choice of directors, is unlawful and void: first, upon the plain letter of our general corporation act (P. L. of 1896, p. 277); and, secondly, upon the reason, spirit and manifest policy of the act."

. The provisions of the New Jersey statute, cited by the learned judge as controlling, are the same as those of our statute, to. wit, that the directors are to be chosen annually by the stockholders, and that each stockholder shall be entitled to one vote, in person or by proxy, for each share of stock held by him, but no proxy shall be voted on after three years from its date. Rev., sec. 1184.

The learned judge proceeds further: "When it says an absent stockholder may vote by proxy, it means that no substitute for an absent stockholder, other than his proxy, may be admitted to vote in his stead. A proxy, *ex vi termini,* is revocable unless coupled with an interest. A proxy is presumably voicing the judgment and will of his principal. An irrevocable assignment of the voting power, or, what amounts to the same thing, an act that irrevocably delegates the voting power to one who has no interest in the stock, upon trust that he will vote according to his own judgment, discretion and will, is an attempt to constitute a substitute voter who is not actuated by any interest in the welfare of the company. The difference is fundamental." Again, he says: "There may be room for dispute as to how unimportant may be the duties of a *bona fide* trustee with respect to the property, in order that the right to vote in the management of the property may be annexed to the trust; but there is, in my mind, no doubt that the right to vote cannot be annexed to a trust which holds only the power of voting. An appurtenant right cannot be appurtenant to itself alone; an incidental power cannot be incidental to itself alone. Such a status is to me as unthinkable as a human voice without a human being, as a lever without a fulcrum; and, of course, to say that the assignment of the mere voting power 'in trust' passes to the trustee, by implication, such interest in the stock as will support the voting power, is the same as to say that the power may be appurtenant to itself alone." In accord with these views is the opinion of the Supreme Court of Georgia in *Morell v. Hoge,* 130 Ga., 625; 61 S. E. Rep., 487; 16 L. R. A. (N. S.), 1136.

The National banking act contains similar provisions. Indeed, in prescribing the qualifications of directors this act goes even further than our own statutes. Sections 5146 and 5147, Rev. Stat. U. S., prescribe that a director must be the owner in good faith of at least ten shares of stock, and the same shall not be in any way pledged or hypothecated, and the three-fourths of the directors must have resided at least one year in the State wherein the bank is located, and must be residents therein dur-

ing their continuance in office. The evident purpose of this enactment is stated in *Concord Natl. Bank v. Hawkins,* 174 U. S., 364.

The views of this Court, as expressed in the three cases cited above, are supported by the *Shepaug Voting Trust Cases,* 60 Conn., 553.

In *Foll's Appeal,* 91 Pa. St. Rep., 434, the Court said: "A National bank is a *quasi*-public institution. While it is the property of its stockholders, and its profits inure to their benefit, it was nevertheless intended by the law creating it that it should be for the public accommodation. It furnishes a place, supposed to be safe, in which the general public may deposit their moneys and where they can obtain temporary loans upon giving the proper security, in the exercise of its equitable power." So that Court refused, "for reasons of public policy, to decree specific performance of a contract to sell certain shares of stock of a bank where such shares were sought for to control the bank, and were being purchased by borrowed money." We can see, therefore, less justification for these voting-trust agreements where the purpose is to obtain the control of the majority of the stock of a banking institution.

It is urged upon us that this voting-trust agreement ought to be sustained, because it was intended to prevent the control of a majority of the stock of the bank from passing into the hands of a stockholder who, to many of the stockholders, seems to be *persona non grata,* and who is buying up the stock and paying for it much more than its market or even book value. It is clear that the control of the stock cannot be acquired by this person unless some of the subscribers to the present agreement are willing to sell their stock to him; some, it seems, have done so; and this agreement prevents the transfer of the absolute and unconditional title. We are, by this argument, asked to sustain this agreement to prevent a man who has invested a large sum of money in the purchase of this stock, who has that direct interest in the success of the bank which an investment of his own money necessarily creates, and who shall be denied the full use of his property by being deprived of an incident or privilege inseparably connected with it; and this to be done in favor of three trustees whose only interest in the stock of the other subscribers is to vote it at the annual or special meetings of the stockholders—to perform a trust uncoupled with an interest. While it may be, in exceptional cases, that some good may be accomplished by such agreements, yet, in our opinion, the general effect is vicious and in contravention of a sound public policy.

It cannot be, nor is it intended to be, denied that those stockholders, be they few or many, owning the majority of the stock of a corporation, can agree, after full consideration, to maintain a certain business policy of the corporation or a certain management, and in giving the right of voting by proxy, our statute recognizes this; to accomplish this, they can give proxies that can last for three years; but these proxies are revocable at the will of the principal, and they cannot be made irrevocable, and the sale of the stock is itself a revocation of the proxy.

While the agreement presented, certainly, in the largest measure, expresses the confidence of the subscribers in the judgment, capacity and integrity of the three trustees named, we are constrained to hold the agreement contrary to public policy and void. There was no error in the order appealed from, and the judgment is

Affirmed.

BROWN, J., *dissenting:* I admit that the decision in the case of *Sheppard v. Power Co.,* to which I assented, is controlling here except in respect of section 2 of the agreement; but subsequent investigation and reflection have convinced me that the principle there enunciated should be somewhat modified. I do not think this Court should adhere to a cast-iron rule regardless of conditions, which will deprive the stockholders of a private corporation of the only effectual remedy which will prevent the control of their property from falling into the hands of a single individual, to be used, possibly, to further his own purposes. In saying this I mean no reflection upon the gentleman who is charged with attempting to monopolize the defendant bank. I know him and believe him to be a young man of integrity and of unusual energy and ability. It is the principle of the thing that influences my judgment. In my opinion, it is the worst possible policy to deny to stockholders, who have invested their money in private corporations, such as banks and manufacturing enterprises, the right to guard their property by "stockholders' agreements" such as the one now before us, from the often blighting effect of one-man power.

We have a recent illustration of this in the case of a great New York capitalist, who wrecked several moneyed institutions he absolutely controlled, and is now repenting at leisure in a Federal penitentiary while stockholders and depositors are bewailing their losses.

Although there is nothing in this record casting a suspicion upon the ulterior motives and purposes of the person seeking control of the bank, yet the facts sworn to in the answer and

affidavits disclose that the mere rumor of his purposes has had a most harmful effect upon its business and prosperity.

The defendant bank, according to those statements, has been remarkably well conducted by the officers selected by the stockholders and who are the trustees named in this agreement. It has paid regularly dividends with steadily increasing surplus and undivided profits and carried a quarter of a million as deposits.

The salaries paid to its president, Mr. Holderness, and to other officials were extremely modest and under their watchful and judicious management the bank has obtained extraordinary success.

About the first of February, 1909, H. C. Bridgers, son of the plaintiff above named, who, it is alleged by the defendants, is the real party in interest, directing, and financing this fight, began to acquire the stock of the defendant bank for the purpose of securing absolute control. The defendants aver that the book value as well as the market value of stock at that time was about $108 per share. At the very beginning of his campaign to acquire a majority of the stock, Bridgers offered and paid from $150 to $160 per share for the stock. Its purchase was quietly made—that is, made through another. Gradually he increased his price, until at length he was paying $500 per share for stock worth in the market by actual book value only $108.

This was all very well for those stockholders who were fortunate enough to sell, but subsequent averments of fact show how it has destroyed the shares of the other stockholders.

The defendants allege and offer to prove that the majority stockholders, believing that the object of Mr. Bridgers was injurious, and realizing the menace to them and to their fellows, who had gone into the enterprise at their solicitation, if he should acquire control under such conditions, sought to devise some method by which to avert what they honestly believed to be an impending calamity to the bank. Therefore, on 2 March, 1909, these men, actuated, as they solemnly avow, solely by a desire to protect the interests of the stockholders, minority as well as majority, against what they believe to have been the injurious and hostile designs of Bridgers upon the bank, and actuated by no other motives or purposes, entered into the contract, which is now sought to be annulled. This contract was executed by a majority of the stockholders and those signing it owned from two to seventy shares each.

In justification of such protective measures and as evidence of their good faith and honest purposes in entering into it, the defendants allege and offer to prove that H. C. Bridgers has

bought what he contends is a controlling interest in the stock of the bank, and that the mere circulation of the rumor that he controls the institution has so affected the public confidence that the deposits have been withdrawn until they amount now to only about $120,000. The bank has lost customers, and the remaining stock has declined in value until there is no market for it. These defendants further aver that this decline in deposits and loss of customers did not begin for several months after said H. C. Bridgers began his crusade against the bank, because of the confidence inspired by the act of the majority in making the agreement hereinafter set out, nor did it begin until it was currently claimed by Bridgers that he had acquired a majority of the stock in spite of said agreement.

These allegations of the answer, supported by affidavits, are not denied by replication or counter affidavits.

The agreement, which is set out in the opinion of the Court, is declared to be void upon its face and the defendants are enjoined from executing it.

This decision is ruinous to the minority stockholder, and leaves him to the tender mercies of one man. It is not in furtherance of, but makes against the soundest principles of public policy in placing a monopoly of power in the hands of one stockholder and depriving the others of their only effectual method of preventing it. This, in my opinion, is exceedingly detrimental to the banking, manufacturing and other business interests of the State, which very largely take the form of corporate association.

No prudent person will care to invest his means or deposit his money in a financial institution dominated wholly by the will of one man who elects himself without anybody's help.

It is much the wiser policy to commit the management to three persons, as in this instance, selected by the majority of the stockholders because of their proved capacity. Suppose some large capitalist should secure absolute control of all the banks of Raleigh, can any one doubt that the effect would be very injurious to the minority stockholders and highly detrimental to the true interests of the city?

Yet by its decision this Court has destroyed the only means by which such a calamity could be averted should it be attempted. Unless stockholders are bound by some such agreement as this, entered into for a good purpose and in the common interest, the temptation of a fancy price is generally too strong to be resisted.

The decision in *Sheppard v. Power Co.* is based upon the theory that all such voting agreements, whether accompanied

by transfer of stock certificates to trustees or not, are void *per se* solely because they are contrary to public policy.

In making no exceptions or qualifications, I think the decision is too broad; is not based upon a sound principle, and is contrary to the best and weightiest authority.

1. I am of opinion that such agreements among stockholders of a private corporation are not *per se* void or against public policy, but that their validity should be determined by the propriety and justness of the ultimate purpose which is sought to be accomplished. This is now the generally accepted view, as will be seen by consulting the Am. and Eng. Ency., vol. 29, p. 1077, and cases there cited.

These agreements, accompanied by deposits of stock certificates with trustees, is the usual method of placing the control of a corporation in the hands of persons selected by the majority of stockholders and of preventing absorption by one individual. They have given rise to much litigation, and the decisions as to their legality are numerous. I will not undertake to review them, as it has been most thoroughly done by Mr. Cook, who states his conclusions as follows: "The above decisions seem to lead to the conclusion that a deposit of certificates of stock with trustees for a specified period of time, either with or without a transfer of the same to trustees, is legal, and is not in violation of the usual statute against restraints on the alienation of personal property; and is not opposed to public policy as a restraint upon trade; and is not an implied fraud upon stockholders who are not allowed to participate; and is not an illegal separation of the voting power from the stock; provided always, that no actual fraud is involved in the transaction. In other words, such a pooling of stock is not illegal in itself, but, like all contracts, may be illegal if actual fraud is involved." 2 Cook on Corp., p. 1722-1723, 6 Ed.

In 10 Cyc., 341, Judge Thompson, in his article on corporations, in discussing this question, says: "It seems that the legality of such arrangements will be determined by the design of those entering into them and the purpose they were intended to subserve. They are not necessarily illegal."

And in an elaborate monographic note to *Morel v. Hoge,* 16 L. R. A. (N. S.), 1136, in which this question is exhaustively treated, the editor, summarizing the result of his investigation, says: "The practical question, then, is whether an agreement in this form is *per se* void, as contrary to public policy. * * * Probably the prevailing tendency is toward the view that such an agreement is not *per se* void as against public policy; in other words, that the agreement cannot be declared void irre-

152—20

spective of the propriety of the ultimate purpose to be accomplished, simply because it seeks to accomplish that purpose by severing the voting power of the stock from the beneficial ownership thereof."

The author reviews a great number of adjudicated cases which fully sustain his views. I call attention to only a few.

In *White v. Thomas Inflatable Tire Co.,* 52 N. J. Eq., 178 (1893), it was decided that "A voting trust for a period of ten years, formed for a proper purpose in compliance with a contract made at the time of the organization of the corporation, pursuant to which all the shares were transferred to a trustee under an agreement that he should vote the same for directors in such a manner that the holder of the majority interest should name a minority of the directors, was valid and enforcible so long only as 'the parties retained their original interests and no other rights intervened."

And practically to the same effect is *Clowes v. Miller,* 60 N. J. Eq., 179, 345.

In *Kreisel v. Distilling Co.,* 61 N. J. Eq., 5 (1900), *Magie, Chancellor,* said, "That if a stockholder undertakes to make irrevocable his grant of power to vote his stock, and denude himself for a fixed period of the power to judge and determine and vote as to the proper management and control of the affairs of the corporation, then whether the grant of power is good or not must depend upon the purpose for which it is given; and that the same principles apply when the scheme devised does not embrace a grant of irrevocable power by proxy, but seeks a similar object by the creation of a trust and the appointment of a trustee, to whom the title of the stock is conveyed." Again, he says, "If stockholders, upon consideration, determine and adjudge that a certain plan for conducting and managing the affairs of the corporation is judicious and advisable, I have no doubt that they may, by power of attorney, or the creation of a trust, or the conveyance to a trustee of their stock, so combine or pool their stock as to provide for the carrying out of the plan so determined upon."

The Supreme Court of Massachusetts has rendered a logical and clear decision on this question. It holds that an agreement of various persons to purchase the majority of the stock of a corporation, the stock when purchased to be voted by a committee of five of the subscribers for at least three years, is not illegal, even though the title to the stock is given to a trustee during that time. The Court, speaking through *Holmes, C. J.,* said: "We know nothing in the policy of our law to prevent a majority of the stockholders from transferring their stock to

a trustee with unrestricted power to vote it.  *  *  *  A stockholder has a right to put his shares in trust, whatever his motive.  If the trust is an active one he cannot terminate it at will, and the attempt to cut him off by contract, instead of by the imposition of duties, from ending it, certainly is not enough to poison the covenant with the plaintiff.  It might be held that the duty of voting incident to the legal title made such a trust an active one in all cases.  As to the arrangement for the trustees uniting to elect their candidates, the decisions of other States show that such arrangements have been upheld, and we do not think that it needs argument to prove that they are lawful.  If stockholders want to make their power felt, they must unite.  There is no reason why a majority should not agree to keep together."

In support the learned judge cites *Brown v. Steamship Co.,* 5 Blatchford; *Greene v. Nash,* 85 Me., 148; *Williams v. Montgomery,* 148 N. Y., 519; *Faulds v. Yates,* 57 Ill., 416; *Smith v. Ry.,* 115 Cal., 584; *Fisher v. Bush,* 86 N. Y., 618.

In conclusion he says: "We have considered such decisions elsewhere as have been called to our attention or found by us. Few of them are by courts of final resort."  In Purdy's Beach on Private Corporations, sec. 704 A, it is said: "Stockholders of a majority of the stock may lawfully combine to hold control of the corporation, and for a definite time may lawfully agree among themselves to vote as a unit."  "Such agreements are not contrary to public policy."  Mr. Macham says that there are no possible objections to such voting contracts intended to secure control for the general benefit.  Macham Law of Corporations, secs. 1268-1269.

In *Gray v. Bloomington and N. R. R. Co.,* 120 Ill. App., 159, it was held, "That an agreement among the promoters of a railroad corporation by which the stock of the individual parties was to be placed in trust in the hands of one of them for a period of ten years, and voted as a unit at all stockholders' meetings as four-fifths of the parties thereto should direct, in writing, is not contrary to public policy and void; the purpose being to vest and retain for a fixed period the management and control of the enterprise in the persons originally promoting the same."  To same effect is *Griffith v. Jewett,* 9 Ohio Dec. Rep., 627, and *Greene v. Nash, supra; Schwartz v. R. R. Co.,* 6 Ohio C. C., 415; *Moses v. Scott,* 84 Ala., 608.

In *Cone v. Russell,* 48 N. J. Eq., 208, the agreement was held void as against public policy because it provided that the shares should be so voted as to continually employ an interested person as manager of the corporation.

Commenting upon *Foll's Appeal* (cited in the majority opinion), the New Jersey Court says: "Following the reasoning of these cases (*Foll's Appeal,* 91 Pa. St., 434, *et al.*), I conclude that the contract complained of in this suit is void as against public policy.  The conclusion does not reach so far as to necessarily forbid all pooling or combining of stock, when the object is to carry out a particular policy with the aim to promote the best interest of all the stockholders.  The propriety of the object validates the means, and must affirmatively appear."  See, also, *Woodruff v. Dubuque and S. C. R. Co.,* 30 Fed., 91, last page; *Hey v. Dolphin,* 92 Hun., 230; *Mobile and Ohio R. R. Co. v. Nicholson,* 98 Ala., 92.

And so the validity of agreements, unaccompanied by proxy or trust, having for their object the control of the voting power of stock, have, by parity of reasoning, been upheld in numerous cases.  *San Francisco v. U. P. R. R. Co.,* 115 Cal., 584, L. R. A. (35), 509; *Faulds v. Yates,* 57 Ill., 416, 11 Am. Rep., 24; *Havemeyer v. Havemeyer,* 11 Jour. and S., 506.

Were it not for unduly lengthening this opinion, I could cite many other cases sustaining the view that the legality of voting agreements, especially, as in this case, accompanied by assignment of stock certificates to trustees, should be judged according to the purpose to be accomplished.  There are but few that can be cited in support of the contrary view.

The cases cited in the opinion of the Court, except our own decisions, either fail to support or are easily to be distinguished from this.

*Foll's Appeal,* cited by the Court, is in line with what I contend for.  The Pennsylvania Court declined to decree specific performance of a contract for sale of bank stock purchased in order to give one man absolute control.  The Court says: "We have no intimation that the bank, as at present organized, is not prudently managed.  The stock, as now held, is scattered among a variety of people.  It is difficult to see how the small stockholders, who have their modest earnings invested in it, the depositors who use it for safe-keeping their moneys, or the business public who look to it for accommodation in the way of loans, are to be benefited by the concentration of its stock in the hands of one man.  *  *  *  The temptation to use it for personal ends is very strong."  And the Court calls attention, as I have already done, to the fact that the financial wrecks of banking institutions, with which the pathway of the last few years is so thickly strewn, is largely the result of one-man control.  The reasoning of the opinion is a powerful argument

against the destruction of this agreement, designed by stock-
holders solely to prevent the control of their institution by a
single individual.

The authority most relied upon in the opinion of the Court
as supporting our decisions is *Vice Chancellor Pitney's* opinion
in *Warren v. Pim*, 66 N. J. Eq., 353. The Court was divided,
and five opinions were delivered. Only five judges concurred
with the *Vice Chancellor*. The voting trust was set aside by a
vote of seven to six upon grounds different from those urged
in the case at bar. Mr. Cook says, referring to this case, "How-
ever, the decision was upon another phase of the case than that
now under consideration. For the decision of the lower court
is that 'voting trusts are not declared to be necessarily unlaw-
ful. They may or may not be lawful, according to the circum-
stances of the case. The general rule is that, *prima facie,* they
are unlawful, but may be rendered lawful by the circumstances,'
was practically affirmed." 2 Cook (6 Ed.), p. 1724.

As to *Morel v. Hoge,* cited by the Court, a cursory reading of
the conclusion of the opinion of *Chief Justice Fish* indicates
plainly that the voting agreement was set aside for reasons not
at all applicable here. The commentator says, in L. R. A., p.
1137, the case "did not involve a voting trust by which the
right to vote the stock was severed from the beneficial owner-
ship."

The *Shepaug Trust Cases,* 60 Conn., 553, the only remaining
precedent cited by the Court, are among the earliest cases on
the subject. They applied to the doings of a syndicate formed
to get control of a railroad company, a *quasi*-public corporation
affected with a public use. I confine myself for authority to
cases which consider the validity of the agreement from the
standpoint of stockholders in strictly private corporations in
which the public have no interest, except incidentally as in good
management. Therefore such cases as the above, as well as the
*Northern Securities Co. case,* 193 U. S., 197, have no appli-
cation.

2. It must be admitted that the purpose of this trust is one
highly and equally beneficial to all the stockholders, depositors
and other patrons of the bank, unless the control of one untried
owner is to be preferred to that of three trustees of proved
capacity.

The public policy which will set aside a contract is not
founded upon judicial caprice, but in the common law, which
will not permit a thing to be done or omitted if it is clearly
injurious to the public welfare. But the power to declare a
contract void as opposed to public policy is not to be lightly

exercised by the courts.   For, as Clark on Contracts, at pages 414, 415, says, "It is clearly to the interest of the public that persons shall not be unnecessarily restricted in their freedom to make their own contracts.   'It must not be forgotten,' was said by an English judge, 'that you are not to extend arbitrarily those rules which say that a given contract is void as being against public policy, because if there is one thing which more than another public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred and shall be enforced by courts of justice.   Therefore, you have this paramount public policy to consider, that you are not lightly to interfere with the freedom of contract.' "   (See *Printing and Numerical Register Co. v. Sampson,* L. R. 19 Eq., 462.)

The individual's right of private contract must yield to the superior right of society, that no valid and enforcible agreement shall be entered into which will work or which is of a nature calculated to work a public injury.   Further than this, the common law does not seek to restrain the liberty of contract.   It is trifling with the subject to offer an argument to sustain the proposition that an agreement calculated and intended to maintain this bank in the highest credit and efficiency is injurious to the public interests.

The public expressed its own opinion by withdrawing half the deposits as soon as it was rumored that one man had acquired control of the bank, and it was to prevent further injury to its waning credit that this contract, or voting trust, was at once entered into.

3. The agreement violates no statute of this State.   It is not a proxy good for three years only under Revisal, sec. 1184, but an assignment of the stock certificates to trustees impressed with a trust to carry out a lawful purpose, beneficial alike to all shareholders.   Mechem, sec. 1268.

There is no more objection to assigning certificates of stock in a private corporation in trust for a lawful purpose than any other property.   Nor does this agreement violate the banking laws of the United States.   The only pertinent section of Rev. Statutes U. S. is 5114, and is as follows: "In all elections of directors, and in deciding all questions at meetings of shareholders, each shareholder shall be entitled to one vote on each share of stock held by him.   Shareholders may vote by proxies duly authorized in writing, but no officer, clerk, teller or bookkeeper of such association shall act as proxy; and no shareholder whose liability is past due and unpaid shall be allowed to vote."

BRIDGERS *v.* BANK.

The defendants do not rest their right to control this stock upon the idea that the agreement is nothing more nor less than a proxy. They hold the legal title as trustees to carry out the trusts imposed. In 2 Cook on Corporations, p. 1664, it is said: "It is a general rule that a person holding stock as trustee is entitled to vote upon the stock, not only when he is duly registered as the holder of the stock in trust, but also when he is registered absolutely as a stockholder upon the books of the corporation." Also, see *Brightman v. Bates, supra.*

It is true that directors' shares must not be pledged or hypothecated, but that doubtless means for debt. But if it does not, there is nothing in the record to show that any of the shares assigned in this trust are owned by directors, or that the directors own no others.

4. There is one feature of this case entirely overlooked in the opinion of the Court, and that is the contract for the sale of the stock contained in section 2 of the agreement, set out in full in the statement of facts preceding the opinion. This section gives to the defendants the right to purchase the shares of stock, or to sell same to purchasers of their selection at not less than its book value. Although the voting trust may be annulled, this part of the contract ought not to be, as its validity is universally sustained, and it is separate and distinct from the other parts of the instrument.

2 Cook on Corporations, at pages 1708-1711, says: "A stockholder has a right to sell his stock at any time and to whomsoever he pleases, without regard to other stockholders. * * *" Hence contracts are often entered into between a portion or all of the stockholders of a corporation, that they will hold and sell their stock together. Such a contract is legal." And again: "Another form of contract is to the effect that before any of the stockholders sell their stock they shall offer it to the other stockholders. This kind of contract is also legal, and will be enforced by the courts. A contract whereby a stockholder desiring to sell must first offer his stock to other stockholders is not contrary to public policy." *Scruggs v. Catterhill,* 67 N. Y. App. Div., 583; *Havemeyer v. Same,* 86 N. Y., 618; *Fitzsimons v. Lindsay,* 205 Pa. St., 79; *In re Lindsay Est.,* 110 Pa. St., 224.

I think the option feature of this instrument is separate and distinct from other parts of the contract and may be enforced, and thus interposes an effectual bar to the granting of the relief sought, which seeks to annul the whole contract and to enjoin the defendants from taking advantage of any part of it.

5. I do not think that the plaintiff, who is a stranger to the agreement, and does not claim by assignment any of the shares of stock described in it, can maintain this action. *Zimmerman v. Jewett,* 19 Abbott's New Cases, 459.