| Chester H. Medbery et al vs. Newport Gas Light Company et al | Eq. No. 2200 |
|---|---|
| Newport Gas Light Company vs. William P. Sheffield, et al. | Eq. No. 2201 |

May 24, 1928

CAPOTOSTO, J. The first of these bills, No. 2200, was filed January 7, 1928. Sixty-six individuals are complainants and the Newport Gas Light Company and its officers are respondents. The prayer of the bill is that the respondent enter upon its list of stockholders the names of the complainants as the owners of twenty shares each, with the exception of the complainant L. W. Cliniff, who was to be listed as the owner of two shares; that the respondent issue stock certificates to the complainants in the manner indicated, and that it be required to recognize the complainants as owners of capital stock in the company. Upon the filing of the bill on January 7, 1928 and on application of counsel for the complainants an ex parte mandatory order was entered by a justice of this court.

The second bill, No. 2201, was filed on January 9, 1928. In this bill the Newport Gas Light Company, its directors, and the members of a Stockholders' Protective Committee are the complainants, and seven individuals, claiming to have been elected as officers and directors of the gas company at an alleged stockholders' meeting held on January 9, 1928, are the respondents. The complainants in this bill allege that the gathering of various persons at the office of the Newport Gas Company was not a stockholders' meeting and that the respondents in fact were not elected to any office.

Both cases were heard on their respective prayers for preliminary injunction in January 1928. At the con-

clusion of the hearing, the Court suggested and counsel agreed that, in view of the full hearing which has been granted, the pleadings should be closed, issues framed, and the case be treated as submitted on the merits. In due time the issues were filed in the respective cases. Fifty-two issues of fact have been agreed to by the parties in Bill 2200; ninety-four issues of fact have been stated with regard to Bill 2201. Counsel requested and were granted permission to file briefs on or before May 15, 1928.

The controversy involves the control and management of the Newport Gas Light Company. A chronological survey of the situation as disclosed by the evidence may be of considerable assistance in ascertaining the real situation.

The Newport Gas Light Company operates under a charter which limits the right to vote at stockholders' meetings as follows:

> "Every stockholder shall in person or by proxy be entitled to one vote for every share which he or she may hold not exceeding twenty; and to an additional vote for every ten shares over twenty; *Provided*, that no stockholder shall have more than forty votes in his or her own right."

The charter of the Gas Light Company, as amended in 1886, also provides that "the board of directors of said company *may be increased in number to seven*". The by-laws adopted November 15, 1914, expressly provide that "the board of directors *shall consist of five members* who shall be stockholders . . ". All these provisions of both charter and by-laws were in force in January 1928.

The Gas Company operates under an authorized capitalization of $500,000 represented by 5000 shares of stock actually issued and outstanding. Up to 1927 this stock was held almost entirely by local investors. The first di-rect notice to the Newport Gas Light Company that any outside interests were concerned with the affairs of the Gas Company came at an interview between William P. Sheffield, Esq., and the president and treasurer of the Gas Company. This was early in April 1927. It was intimated at this time that a campaign was contemplated by the Utilities Power & Light Corporation to gain control of the Newport Gas Company; that it was willing to pay $150 a share for the stock, and that it might be advisable for those connected with the Gas Company to cooperate in this project for various reasons. Mr. Sheffield's connection with the Utilities Power & Light Corporation may be described most clearly by his own words. "Well, I am not an officer or a director of the Utilities Power & Light as such. . . I happen to be an officer in a number of their subsidiary companies. . . I am vice-president and secretary and a director of the Colonial Gas & Electric Company, which is the holding company that owns the New England companies of the Utilities. I happen to be president and a director of the Newport Electric Corporation, and then there is another subsidiary, the Colonial Coach Company, of which I am not positive, but I am pretty sure, that I am treasurer and a director." (Tr. p. 99-100.)

This interview resulted in an open breach. The Utilities Corporation began an open campaign to secure possession of any and all stock of the Gas Company which it could secure. The sale of such stock was solicited through persons, by circulars and by public advertisements in the local press. Miller and George, The Rhode Island Hospital Trust Company and the Aquidneck National Bank were the mediums through which this stock was collected. All stock purchased in this manner, representing in all 1225 shares ultimately came into the possession of the Aquidneck National Bank anl stood in its

name upon the books of the Gas Company. These 1225 shares plus 77 shares, which stood in the name of Edward P. Gosling but which really belonged to the Utilities Corporation, or 1302 shares, constituted the total number of shares of stock of the Gas Company which the Utilities Corporation owned on January 4, 1928.

While the Utilities Corporation was promoting its interests the, Gas Company was using every effort to protect its own rights. In April or May 1927 a Stockholders' Protective Committee was formed. Through its activities 2286 shares were deposited with the Newport National Bank. On or about January 4, 1928 the Newport Gas Company controlled a total of 3592 shares of its own stock. Under the terms of the charter these shares were entitled to 1323 votes in a stockholders' meeting in the absence of any technical objections to the right to vote any share or shares of that particular block of stock.

On January 4, 1928, the complainant Chester H. Medbery in Bill 2200 was given certificates endorsed in blank representing 1302 shares of stock of the Newport Gas Light Company then standing in the name of the Aquidneck National Bank and Edward P. Gosling by Mr. Gosling, Vice President and General Manager of the Newport Electric Company, with instructions to take them to the office of the Gas Company, see its treasurer, Mr. Austin, and ask that the 1302 shares be transferred to the persons named and in the amounts indicated on a general list accompanying the certificates presented. According to the request made all persons named on the list with the exception of one, who was to receive 2 shares, were to be entered upon the stock book of the Gas Company as the holders of twenty shares of stock. Mr. Medbery carried out his instructions. At the time the stock certificates were presented or shortly afterwards the New-

port Gas Company, through its treasurer, Mr. Austin, requested information before making any transfer as to how the stock was to be divided, that is, to whom the Gosling shares and the bank shares respectively were to go; evidence of the authority of the person signing in behalf of the bank to act in that capacity; evidence of the bank's authority to transfer the shares, the Gas Company having notice, either direct or constructive, that the bank held them in some fiduciary capacity; and evidence that the Utilities Corporation, if it were the real owner, consented to such transfer. This information was not furnished, the complainants in bill 2200 taking the position that the stock certificates being endorsed in blank imposed the obligation upon the Gas Company to transfer the stock to the persons and in the manner requested without other formalities or information.

At this point it may be advisable to consider briefly who the proposed transferees were and how the list was prepared. With one exception all the contemplated future stockholders of the Newport Gas Company were connected in one capacity or another with companies affiliated with the Utilities Power & Light Corporation. The list included attorneys, officers, directors, superintendents of departments, store managers, clerks, stenographers, master mechanics, draftsmen, carpenters, bus starters and repair men. The splitting of the stock in the manner indicated was determined upon early in December, 1927. A list of proposed transferees was subsequently prepared at the office of the Utilities Corporation in New York and forwarded by a Mr. Tuttle, a member of the firm of Mathews & Goegel, Attorneys of Chicago, Illinois, to Mr. Gosling in Newport. This list was then revised in Newport and assumed its final shape ". . . on the morning

of the 4th of January; those last few names were added." (Tr. p. 118).

The proposed transferees had no real interest in the stock which was to be transferred to them. Any apparent or paper rights which these transferees might have acquired had the Gas Company consented to the transfer were divested in fact by the execution of stock powers in favor of the Utilities Corporation. Their voting rights also were taken away from them by proxies to the Utilities Corporation. They were mere dummies. The Utilities Power & Light Corporation was the real and absolute owner of all this stock.

Let us see what results would have followed if the Gas Company had transferred the shares of stock as requested. If the plan adopted by the Utilities Corporation had been successful, it would have been able to cast 1,302 votes at a stockholders' meeting out of a holding of 1,302 shares. Granting that Mr. Gosling's 77 shares could be voted as entered upon the records of the Gas Company, and that the 1,225 shares held by the Aquidneck National Bank were voted by the real owners, the Utilities Power & Light Corporation would be entitled to but 65 votes in a stockholders' meeting according to the terms of the charter. As a consequence of the plan devised by the Utilities Corporation, the 3,592 shares of stock with a real voting power of 1,323 votes controlled by the Newport Gas Light Company would have been placed, therefore, in an unfair position and with the probability of disastrous results.

The annual stockholders' meeting of the Newport Gas Light Company was set for 10 o'clock in the forenoon of January 9, 1928. On January 6, 1928, Mr. Walter Curry, of counsel for the Gas Company notified Mr. Sheffield, who was interested on behalf of the Utilities Corporation, that in order to give the matter of the requested stock transfer the necessary consideration the Gas Company was ready to adjourn the annual meeting without attempting to do any business except adjourn so as to give opportunity for proper investigation. This suggestion was refused. On January 7, 1928, the Medbery bill (Eq. 2200) was filed and an ex parte mandatory order secured requiring the Gas Light Company and its officers forthwith to recognize the sixty-six complainants as stockholders.

This ex parte order was served by a deputy sheriff at the office of the Gas Light Company a few minutes before the time set for the stockholders' meeting on January 9, 1928. What followed may be left more to the imagination than to description. A gathering of excited laymen and still more excited lawyers went through the motions of a so-called "corporation meeting." There were requests for time, protests and counter protests, charges and recriminations, all in language and conduct which bordered upon the realm of open violence. The Newport Gas Company, while it protested the legality of the entire proceedings, was practically forced to present a slate of five directors and cast its votes for its candidates. The opposition offered a list of seven directors in open disregard of the by-laws then in force, and voted its stock for those seven directors as if the proposed transfers to the sixty-six persons named on the list submitted had actually been made. The final outcome was the alleged election of two sets of officers and injured personal feelings. The Newport Gas Company thereafter filed a bill in equity (No. 2201) seeking to avoid the results, if any, of this so-called meeting of January 9, 1928.

It is unnecessary to answer each of the 146 issues of fact submitted. In the opinion of this Court the rights of the parties can be fixed by the determination of a few but vital issues.

Directing our attention to Bill number 2200, the first question is: Have the complainants shown any right to

prosecute the bill? It is definitely established by the evidence that the sixty-six complainants in this bill have no beneficial interest in any shares of stock of the Newport Gas Light Company. The true and sole owner is the Utilities Power & Light Corporation which is not a party to the bill. This litigation is manifestly conducted by the Utilities Corporation through mere dummies without submitting itself to the jurisdiction of the court.

It is a known rule that no one has a right to prosecute a suit, particularly a suit in equity, who has no interest in the subject matter of the litigation.

21 C. J. 261, Sec. 254.

Whenever it appears that a party has assigned all of his interest in the matter in controversy before suit or during the pendency of the action such party cannot further prosecute the suit.

*Keyser* vs. *Renner*, 87 Va. 248.
*Automatic Switch Co.* vs. *Cutler Hammer Mfg. Co.*, 147 Fed. 250.
*Fulton* vs. *Graecen*, 44 N. J. Eq. 443.
*Pittsburgh S. N. R. Co* vs. *Fiske*, 178 Fed. 66.

The signing of stock powers to the Utilities Corporation by all the proposed transferees, whereby they assigned any possible interest which they might acquire from the transfer of any stock into their individual names, divested such proposed transferees of all possible claim as stockholders and revoked any outstanding proxies to vote that stock.

*Bridgers* vs. *First National Bank*, 152 N. C. 293.
*Witham* vs. *Cohen*, 100 Ga. 670.

The Newport Gas Light Company is entitled to have any controversy between itself and opposing interests conducted not by strangers but by the real claimant. The Court finds, therefore, that the complainants named in Bill 2200 have no right to prosecute the bill.

The second question is: Can the voting rights of the stockholders as defined in the charter of the Newport Gas Light Company be changed or evaded by the scheme which was resorted to in this case?

As the stock stood on the books of the corporation at the time Bill number 2200 was filed, the Aquidneck National Bank and Gosling would be entitled to a maximum of 65 votes. Can the charter provision which limits the number of votes that a stockholder may cast be evaded by splitting the stock into smaller units and transferring those units to persons who have no real interest in the corporation? Can 65 votes be stretched out to 1,302 votes by any such plan?

The current of American authorities is almost unanimous that what the Utilities Power & Light Corporation attempted to do in this case can not be done.

14 C. J. Sec. 1403, p. 907.
3 Cook on Corporations, Sec. 622 b, page 2803.
3 Fletcher on Corporations, Sec. 1681, age 2818.
*Campbell* vs. *Poultney Ellicott and Company*, 6 Gill & J. 94 (Md.).
*Webb* vs. *Ridgely*, 38 Md. 364.
*State ex rel. Danforth* vs. *Hunton*, 28 Vt. 594.
*Gould* vs. *Head*, 41 Fed. 240.
*Mack* vs. *De. Bardeleben Coal & Iron Co.*, 90 Ala. 396.
*Howe* vs. *Roberts*, 209 Ala. 80.
*Cross* vs. *Farmers' Elevator Company*, 31 N. D. 116.

The clause in the charter of the Newport Gas Light Company defining the voting power of its stock is too clear and emphatic to be disobeyed or evaded. What cannot be done directly cannot be done through subterfuge. The charter restraint on the voting power of the stockholders was adopted for very wise and conservative purposes. The evidence upon this point shows a clear violation of the spirit

and principles of the charter. The party resorting to such evasions as were attempted in this case is hereby denied the approval of the Court.

The third question may be stated as follows: Was the Newport Gas Light Company justified in requiring the evidence of authority, etc., which it requested before recognizing the complainants in Bill No. 2200 as stockholders?

A corporation owes a duty to its stockholders to investigate requests to have stock transferred and to reasonably satisfy itself of the authority of the person demanding such transfer to make it.

In the present case the Newport Gas Company had actual or constructive notice that its stock was being purchased by the Utilities Power & Light Corporation, and that such stock was being collected for the Utilities Corporation by the Aquidneck National Bank. When Mr. Medbery presented the certificates of stock standing in the name of the Aquidneck National Bank and requested that they be transferred to sixty-six proposed transferees, the Newport Gas Company used reasonable diligence in demanding proof of authority to make such requested transfers.

Peck vs. Bank of America, 16 R. I. 710.

Peck vs. Providence Gas Company, 17 R. I. 275; 282.

The Newport Gas Company was entitled to know from which particular block of shares the specific allotment of 20 shares was to be made to any particular transferee. It was not called upon to make a distribution at its peril.

A corporation occupies, in many respects at least, the position of a trustee towards all its stockholders. The Gas Company, with notice that something was on foot with reference to its stock, was bound to use reasonable diligence to see that no transfers in violation of the letter or spirit of its charter to the detriment of innocent stockholders were made. The Court, therefore, finds that the Newport Gas Light Company had a right to demand the information which it sought before making the requested transfers in order that it might properly discharge its legal duty to the real stockholders of the company.

The complainants in Bill No. 2201 seek to enjoin the candidates for Directors presented by the Utilities Corporation at the alleged meeting of January 9, 1928, from attempting in any way to act as directors or officers of the Newport Gas Light Company and to restrain them "their servants, agents, and employees from interfering with the complainant directors in the performance of their duties as such, and from interfering in any way with the property, business or affairs of the company." The entire issue presented by this bill depends upon the validity of the meeting of January 9, 1928. The question, therefore, is: Was the meeting held January 9, 1928, a valid annual meeting of the stockholders of the Newport Gas Light Company?

A corporation meeting held under circumstances which show an abuse of legal process, or the carrying out of any plan designed to prevent a fair election, or both, is not valid.

People vs. Albany & Susquehanna Railroad Company, 55 Barb. (N. Y.) 344.

Caranica vs. Belba, 131 Atl. (R. I.) 840.

The character of this alleged meeting already has been outlined. The term "meeting" is a misnomer. Generally speaking, it may be described as an unbalanced, tumultuous and disorderly proceeding. The Newport Gas Light Company did not in fact hold a stockholders' meeting on January 9, 1928.

The four questions hereinbefore discussed are considered determinative of all issues presented. The remaining 142 issues as framed by the parties are either collateral or incidental to

the main questions involved and are therefore left unanswered.

Bill No. 2200 is hereby dismissed and any restraining order therein heretofore entered is hereby dissolved. In Bill No. 2201 the complainants are entitled to the relief prayed for, and an injunction in accordance with the prayer in said bill contained is hereby granted.

In Equity No. 2200.

For complainants: Edwards & Angell.

For respondents: Huddy & Moulton, Moore & Curry, Swan, Keeney & Smith.